LEWIS, *Public Administrator*, *Appellant*, v. COATES
*et al.*, *Executors*.

**Contract, Construction of.**     Plaintiff's and defendant's dece-
dents entered into a contract containing the following provisions :
"Whereas, Thomas Poe, of Saint Louis, is the owner of the steamer
Fearless ; and, whereas, he is the purchaser of the three barges,
Iron Mountain, Brookbank, and Charlie Pearce, by verbal contract ;
and, whereas, he has subscribed to the capital stock of the com-
pany, to be known as the Missouri Valley Transportation Company,
the sum of thirty thousand dollars ; and, whereas, he has doubts
about his ability to pay the balance on said stock, amounting to
fifty per cent. of the same, should the same be called for by the
company to increase its transportation facilities.   Now, it is agreed
by the said party of the first part, that he will sell to the said party
of the second part, for the said company, the said steamboat for
the sum of nineteen thousand dollars, and the said three barges for
the sum of eighteen thousand dollars, to be paid for so soon as the
transfer is made with clear title.   *   *   *   It is further agreed by
the said Coates (party of the second part) that in case of the inability
of the said Poe to pay, as aforesaid, the said remainder of fifty per

cent. on the stock which he has subscribed, when required for increasing the transportation facilities as aforesaid, that he will buy, and take off his hands, one hundred and ten shares of said stock." *Held* (1) that under the contract the inability of Poe to pay the remainder of the stock subscription, when required, was the only condition of the liability of Coates to take the one hundred and ten shares of stock; and (2) that even if the contract be construed to mean that Coates was not to take the one hundred and ten shares, unless the call on Poe for the remainder of his subscription was made to increase the transportation facilities of the company, the evidence shows that condition to have been.complied with, and the judgment on that theory should have been for the plaintiff.

*Appeal from Jackson Circuit Court.*—Hon. F. M. Black, Judge.

Reversed and remanded.

*Given Campbell* and *J. F. Mister* for appellant.

(1) Taking the whole transaction together, it amounts to this substantially : To induce Poe to make a large subscription, nearly one-third of the capital stock, Coates agreed to take one hundred and ten shares of it at par, if Poe was unable to pay the balance of his subscription. Poe's inability is shown beyond controversy and Coates' liability is absolute. (2) The defendant covenanted to take, and buy the stock, in case of such inability, and he is bound to perform that agreement. And for a breach, must respond in damages to the extent of a complete indemnity. *Orr v. Bigelow,* 14 N. Y. 556; *Lamson v. Lamson,* 52 Vt. 595. (3) Every instrument is to be interpreted by a consideration of all of its provisions, and its obvious design is not to be controlled by the precise force of single words. *Chase v. Bradley,* 26 Me. 531; *Varnum v. Thurston,* 17 Md. 470; *Heygood v. Perrin,* 10 Pick. 228; *Kelly v. Mills,* 8 Ohio, 325; *Stewart v. Lang,* 37 Pa. St. 201; *Springteen v. Samson,* 32 N. Y. 703; 1 Add. on Cont. (3 Am. Ed.) secs. 220, 234, 231, 225; Chitty on Cont. 810, and note, 76 to 95; *Dow v. Tut-*

*tle*, 4 Mass. 414; *Nash v. Towne*, 5 Wall (U. S.) 699. (4) In the construction of written instruments, the intention of the parties must govern, and to ascertain that intention, regard must be had to the nature of the instrument itself, the condition of the parties executing it, and the object which they had in view. *Strong v. Gregory*, 19 Ala. 146; *Montgomery v. Insurance Co.*, 16 B. Mon. 427; *Knower v. Emerson*, 9 Pick. 422; *Springteen v. Samson*, 32 N. Y. 703; *Nash v. Towne*, 5 Wall. 699. (5) Where a covenant, or stipulation, goes only to part of the consideration on both sides, and a breach of such covenant may be paid for in damages, it is an independent covenant, and an action may be maintained for a breach of the covenant, without averring performance in the declaration. *Boone v. Eyre*, 1 H. Black. 273, note *a*; *Campbell v. Jones*, 6 Tenn. 570; *Mill Dam Foundry v. Howry*, 21 Pick. 436; *Knight v. New England Worsted Co.*, 2 Cush. (Mass.) 286; 2 Parsons on Cont. 529, note *r*; *Turner v. Mellier*, 59 Mo. 526.

*Pratt, Brumback & Ferry* for respondent.

(1) The court cannot, in construing the contract, disregard the words, "increasing the transportation facilities." "Every clause and even every word of a contract should, when possible, have assigned to it some meaning, and a harmonious whole be made to appear, for so the parties plainly intended, nor especially should they wilfully insert in their contract a mere idle provision." Bishop on Cont., sec. 579; *Heywood v. Heywood*, 42 Me. 229; *Barron v. Placide*, 7 La. An. 229; *Metcalf v. Taylor*, 36 Me. 28; *Hyderville v. Slate Co.*, 44 Vt. 395; *Churchill v. Bemer*, 8 Bush, 256, 260; *Randall v. Canal*, 1 Harr. (Del.) 151; *Buck v. Watkin*, 14 Beav. 425; *Corbin v. Healy*, 20 Pick. 514; *Herrick v. Hopkin*, 23 Me. 217. The administrator in his petition alleged that the call was to increase transportation facil-

ities, and recognized this express provision as material. (2) The words, "increasing transportation facilities," in the contract, mean adding another fleet, or in some way materially increasing carrying capacity. (3) The surroundings, circumstances, and facts testified to by Coates leave no doubt as to meaning of transportation facilities. "Though the writing cannot be orally contradicted, except it be reformed in equity as not expressing what both parties intended, or under equitable rules, is to be treated as thus reformed, yet the parties' surroundings, their relations to each other, and the like, may be shown as helps to the understanding of their written stipulations." Bishop on Cont., sec. 576; 1 Greenl. E. id., sec. 297; Add. on Cont. (7 Lon. Ed.) 164; *Maryland v. Railroad,* 22 Wall. 105; *Dodge v. Gardiner,* 31 N. Y. 239; *Pollard v. Maddox,* 28 Ala. 321; *Sumner v. Williams,* 8 Mass. 162, 214; *Price v. Evans,* 26 Mo. 30; *Codman v. Johnson,* 106 Mass. 491; *Masters v. Freeman,* 17 O. St. 323; *Hutchins v. Hebbard,* 34 N. Y. 24; *Webster v. Blount,* 39 Mo. 500; *Salisbury v. Andrews,* 19 Pick. 250, 253; *Knight v. New England Co.,* 2 Cush. 271. (4) The twelve per cent. call, as the record of the company for the call expressly states, was made to pay debts against it, and the proof shows that all such debts were made in running the fleet got at the outset, and mentioned in the contract. Again the contract uses the words, "the balance on said stock," and "should the same be called for," and "inability of the said Poe to pay as aforesaid the said remainder of fifty per cent. on the stock which he has subscribed, when required for increasing transportation facilities." The plain meaning is that the whole of the balance must be called for, not a part of it. The parties so agreed, and the court cannot make a new agreement. *Perry v. Cooper,* 8 Mo. 206; *Allen v. Davis,* 11 Mo. 480; *Chouteau v. Russell,* 4 Mo. 554.

BRACE, J.—This action was brought to recover the sum of $10,994.50, the difference between the par value of one hundred and ten shares of the capital stock of the Missouri Valley Transportation Company, and the price at which said shares were sold at public auction, at administrator's sale, by the plaintiff, in pursuance of an order of the probate court, the par value being eleven thousand dollars ; the price at which they were sold five dollars and fifty cents. The action is based, and the case turns, upon the proper construction of the following written contract, entered into on the tenth day of December, 1880, between the said Kersey Coates, deceased, and the said Thomas Poe, deceased, and more particularly upon the last clause of said contract.

"December 10, 1880.

"Whereas, Thomas Poe, of Saint Louis, is the owner of the steamer Fearless ; and whereas, he is the purchaser of the three barges, Iron Mountain, Brookbank, and Charlie Pearce, by verbal contract ; and whereas, he has subscribed to the capital stock of the company, to be known as the Missouri Valley Transportation Company, the sum of thirty thousand dollars ; and whereas, he has doubts about his ability to pay the balance on said stock, amounting to fifty per cent. of the same, should the same be called for by the company to increase its transportation facilities. Now, it is agreed by the said party of the first part, that he will sell to the said party of the second part, *for the said company*, the said steamboat for the sum of nineteen thousand dollars, and the said three barges for the sum of eighteen thousand dollars, to be paid for so soon as the transfer is made, with clear title. It is agreed by the said party of the second part, for himself ( K. Coates ) and the other subscribers to the stock of said company, that said Poe shall be the commander of the fleet to be composed of the said steamboat and said three barges, at a fair and reasonable compen-.

sation. It is further agreed *by the said Coates*, that in case of the inability of the said Poe to pay, as aforesaid, the said remainder of fifty per cent. on the stock which he has subscribed, when required for increasing the transportation facilities as aforesaid, that he will buy and take off his hands, at par, one hundred and ten (110) shares of said stock.

"K. COATES,

"For himself and for the other members of said proposed company.

"THOMAS POE."

The case was tried by the court without a jury, the finding and judgment was for the defendant, from which the plaintiff appeals and assigns for error: (1) The finding of the court is against the evidence presented at the trial. (2) The finding of the court is against the law, as declared by the instructions given by the court for the plaintiff. (3) Because the court erred in refusing to give the instructions asked for the plaintiff, numbered two, four, and five, and in giving the instructions of its own motion, contained in the record.

If error was committed by the court below, it was in the construction placed upon the last clause of the written contract as manifested by the declaration of law, number one, given for the plaintiff, the declaration given by the court on its own motion, the modification made in number four, and its refusal to give number five, asked for by the plaintiff. Those declarations are as follows, the modification in number four appearing in italics:

"1. The court declares the law to be, that if it appears, from the evidence, that, on or about the tenth of December, 1880, defendant contracted with plaintiff's intestate, that, in consideration that said intestate would subscribe thirty thousand dollars to the capital stock of the Missouri Valley Transportation Company, and would sell to said company the steamboat and barges belonging to said intestate for a specified sum, to be paid for when

clear title is made, he, the defendant, would, in the case of the inability of said intestate to pay the remainder of fifty per cent. on the stock for which he has subscribed, when required for increasing the transportation facilities of said company, buy and take off the hands of said intestate, at par, one hundred and ten shares of said stock; and if it further appears, from the evidence, that plaintiff's intestate did subscribe thirty thousand dollars to the said capital stock accordingly, and did sell to said company the steamboat and barges contracted for at the terms specified, and delivered them to said company with clear title; and if it further appears, from the evidence, that the said company was organized and incorporated, and that plaintiff's intestate paid up fifty-five per cent. of his stock subscription, and was unable to pay a call of twelve dollars per share, made by said company on stockholders to increase transportation facilities; and that the plaintiff, since his death, had not been able to pay said call, nor any part thereof, because of having no assets of said estate sufficient for said purpose, and has not now assets sufficient for said purpose; and if it further appears, from the evidence, that the plaintiff called upon the defendant and notified him of the inability of Poe, and of himself, as Poe's administrator, to pay said call, or to pay the unpaid remainder on said stock subscription, and demanded of the defendant that he buy and take off the hands of the plaintiff one hundred and ten shares of said stock held by Poe, and since his death, by plaintiff, as Poe's administrator; and that plaintiff, as such administrator, tendered one hundred and ten shares of said stock to the defendant, and demanded that he buy and take the same at par, to-wit, eleven thousand dollars, pursuant to his contract; and that the defendant refused to buy or take said one hundred and ten shares of stock; and if it appears, from the evidence, that, subsequently to said demand, and tender aforesaid, the plaintiff obtained an order from the probate court of

Saint Louis, Missouri, to sell said one hundred and ten shares of stock, so tendered as aforesaid, and that said one hundred and ten shares of stock were sold under said order of said court for the aggregate sum of five dollars and fifty cents, and that said sale was approved by said probate court, then the plaintiff is entitled to recover from the defendant, and the measure of damages is the difference between the par value of said stock, to-wit, eleven thousand dollars, and the amount for which it sold under the order of sale, aforesaid, to-wit, the sum of five dollars and fifty cents; which said difference is the sum of $10,994.50, reduced by the unpaid subscription of forty-five per cent. on said one hundred and ten shares of stock, amounting to $4,944.50, and being, after such reduction, six thousand and fifty dollars, together with interest from the time of said demand and tender, and costs of suit."

Declaration given by the court on its own motion:

"The court sitting as a jury, may look to the situation and surroundings of the parties at the time the contract sued upon was made, for the purpose of determining what was meant and understood by them by the use of the words, 'when required for increasing the transportation facilities as aforesaid,' and must also look to the entire contract; and if the parties then contemplated adding another fleet, or in some way materially increasing their carrying capacity, and it was in either of such meanings the parties used the words aforesaid, then such meaning must be used in interpreting the contract, and if the twelve per cent. was not called for any such purpose, then the finding must be for the defendant."

Number four, as modified by the court:

"4. The court further declares the law to be, that the only contingency contemplated by the contract sued upon is the inability of Poe to pay the remainder of his stock subscription, when required for in-

crease of transportation facilities, and if it appears from the evidence that such inability exists, even as to a small part of such remainder, it sufficiently shows inability as to the larger remainder yet uncalled for, and fixes the liability of the defendant to take and buy the one hundred and ten shares of stock according to the terms of his contract with Poe, or respond in damages for failing or refusing to do so, *provided it also appears that such small part was called for by the company to increase its transportation facilities."*

Number five, refused by the court:

"5.     The court declares the law to be, that the clause referring to the paying of the remainder of stock subscription, when required for increasing the transportation facilities of said company, is not in the nature of a condition, nor is the liability of defendant under said contract dependent upon a call being made for that specific purpose, but it is dependent only upon the inability of Poe to pay any part of the remainder of his stock subscription when a call is made therefor for any purpose connected with the operations of said company; and if it appears, from the evidence, that a call was made for any part of the remainder of Poe's stock subscription, even if not altogether required for the increase of transportation facilities, and even if altogether required for other purposes of said company, other than for increase of transportation facilities of said company, and that Poe and his administrator were not able to pay said call, or any part thereof, and that demand and tender was made, as aforesaid, and refused, and that sale of stock was made as aforesaid, and approved as aforesaid, then the plaintiff is entitled to recover from the defendant under said contract, and the measure of damages is as stated in the first instruction asked for plaintiff."

It will be observed, from the action taken upon these declarations of law, that the court refused to declare

"*the inability* of Poe to pay the remainder of his stock subscription *when required*," to be the *sole* condition of Coates' liability, but in effect held that the stipulation in the last clause of the contract, "that he (Coates) will buy and take off his (Poe's) hands at par, one hundred and ten (110) shares of said stock," was not obligatory on said Coates, unless "the remainder of the fifty per cent. on the stock which he (Poe) had subscribed should be required for *increasing the transportation facilities aforesaid*," and that if, by the words, "increasing the transportation facilities aforesaid," the parties meant, "adding another fleet, or in some way materially increasing their carrying capacity," then Coates' liability was dependent, not only upon Poe's inability to pay the remainder of his stock, but upon the further condition, that such remainder should be required for the purpose of "adding another fleet," or for the purpose of "in some way materially increasing their carrying capacity." It must be conceded that if the parties did attach such meaning to the words, "increase of transportation facilities," that meaning cannot be found upon the face of the contract when literally read and interpreted, for according to the letter of the contract the condition would be satisfied whenever that remainder should be required for *any* "increase of transportation facilities." And if such meaning is to be attached to those words, it is because, in making application of the terms of the written contract to the subject-matter thereof, it becomes apparent that such must have been the meaning of the parties.

In order to determine whether this is so or not, and that we may be enabled, if possible, to make the same application of the terms of the contract to the subject-matter thereof that was in the minds of the parties at the time the contract was made, it will be necessary to consider the contract in the light of such knowledge of these parties, their relations to each other, the objects they had in view, and of the circumstances that led up

to and surrounded its making, and of their acts in respect thereto, as can be gathered from the evidence in the case, from which it appears that, in the fall of 1880, and prior to the date of the contract, the respondent, Kersey Coates, and others in the City of Kansas, were engaged in getting up a company to engage in the business of operating a barge line on the Missouri and Mississippi rivers, and their tributaries; this fact coming to the knowledge of Thomas Poe, appellant's intestate, a riverman and the owner of a steamboat called the Fearless, he, on the twenty-seventh of November, 1880, sought an interview with said Coates at Kansas City, and proposed to go into the venture; Coates told him to submit his proposition in writing; Poe did so, as follows:

"Kansas City, November 27, 1880.

"Gents:—I have bought S. B. (steamboat) Fearless for Kansas City and St. Louis grain trade, to run, when business and water will justify, and first propose to borrow twenty thousand dollars, at seven per cent. on stock; give mortgage and secure it to be paid to mortgagee, if any loss. Or I do propose to take nineteen thousand dollars in a fifty thousand-dollar company, boats to run, when not practical in Missouri river, somewhere else, as company directed, must have answer in ten days.

"THOMAS POE.

"P. S. I know of two good barges, without cargo-boxes, can be had for eleven thousand dollars. Two hundred feet long, thirty feet beam, and seven feet hold, will carry eleven hundred tons each; will cost, to cargo-box them, twenty-four hundred dollars, which brings the stock up to near fifty thousand dollars; they are at Cairo, and have to be got soon."

Coates told Poe that nothing could be done without the consent of his associates, and that was the end of their negotiations at that time. Afterwards, the Kansas City parties having subscribed seventy thousand dollars, and wanting to get a St. Louis transportation company

to take the remaining thirty thousand dollars of the proposed one hundred thousand dollars capital stock of the company, appointed a committee, consisting of Coates, and Messrs. Latshaw and McDonald, to go to St. Louis for that purpose, and also to examine the steamboat, Fearless, and negotiate with Poe for it. In the meantime, Poe had entered into a verbal contract for the purchase of the barges "Iron Mountain," "Brookbank," and "Charlie Pearce," mentioned in the contract, and on the tenth of December, 1880, the committee having failed to get a St. Louis transportation company to take the remaining thirty thousand dollars of the capital stock of the company, went to Poe, and the written contract sued on, of that date, was the result of their interview with him. It was written by Coates rapidly, late at night, at the hotel, while the others were talking, and was signed by Coates and Poe. Afterwards, on the twentieth of December, 1880, the articles of association of the Missouri Valley Transportation Company were filed in the office of the secretary of state, and the next day a certificate of incorporation was issued, amount of capital stock one hundred thousand dollars, divided into one thousand shares of one hundred dollars each, all subscribed for and one-half paid up, Thomas Poe taking thirty thousand dollars of the stock, and the remainder of the one hundred thousand dollars was divided among Coates and thirty-five others.

The company paid Poe nineteen thousand dollars for the steamer, Fearless, took and paid for the three barges mentioned in the contract, and also bought two other barges. Poe paid sixteen thousand five hundred dollars on his capital stock, and received a certificate of stock from the company, dated January 1, 1881, numbered twenty, for three hundred shares, showing such payment, took command of the fleet, consisting of said steamer and five barges, and commenced operating the fleet for the company in the business for which it was

organized, and continued to do so until December, 1881,. when he died on a trip he was then making with the fleet to Pittsburg, during which one of the barges was sunk, and a small coal barge was bought and paid for out of moneys earned by the fleet.    The company lost money in running the fleet, from the start.    In the fall of 1881, it was in debt about four thousand dollars, and borrowed that sum.    On the tenth of May, 1882, at a meeting of the stockholders of the company, a motion was adopted to levy an assessment sufficient to pay all debts against the company, and on the twelfth, the board of directors made a call of twelve per cent. on the capital stock, payable on or before May 20, 1882, to pay existing debts created in the course of its business.    Due notice was given to all the stockholders, and the call paid by all except Poe ; on his stock nothing was paid, and it was admitted that Poe's estate had nothing except the three hundred shares of stock, and the contract sued on, and that his administrator had no money or other assets out of which to pay any call on said stock.    In the summer of 1882, the fleet started up the Missouri river and the steamer was sunk, and the company thereupon decided to quit business and wind up its affairs.    The barges were sold for about ten thousand dollars, and about ten thousand dollars was collected from insurance on the steamer.    In September, 1882, the appellant, then being the duly qualified administrator of said Poe, called upon Coates and tendered him one hundred and ten shares of the capital stock of said company, and demanded that he take the same and pay for them at their par value, which Coates refused to do.    Afterwards, in pursuance of an order of the probate court, the administrator sold said one hundred and ten shares of stock at public auction for five dollars and fifty cents in cash, which sale was approved by the probate court, and, on the twenty-seventh of January, 1883, he instituted this suit in the circuit court of Jackson county, held at Kan-

sas City. Since this cause was argued here, the respondent Coates died, and the cause has been revived in the name of his executors, Edward H. Webster and Lindley Coates.

In the foregoing statement, we have endeavored to set out in chronological order all the facts and circumstances of the case that the court would be authorized to take into consideration, in endeavoring to put itself in the place of the parties in order to discover the true intent and meaning of the terms employed by them in the written contract, and make a correct application of those terms to the subject-matter of the contract. Before proceeding to make that application, it may be as well to premise that, whilst the contract speaks of certain things as *having been done*, read in the light of surrounding circumstances it was evidently an agreement *in praesenti* to do certain things *in futuro*, and for all the purposes of this contention may be treated as the contract of Coates and Poe solely. By this contract, then, Poe agreed to subscribe thirty thousand dollars to the capital stock of the company, to sell to said Coates, for the company, his steamboat for the sum of nineteen thousand dollars, to transfer his purchase of the barges to him, for which Coates was to pay the sum of eighteen thousand dollars (presumably the price at which Poe had contracted for them), and Coates agreed that Poe should be employed as commander of the fleet, to be composed of said boat and barges, at a reasonable compensation, and that in a certain contingency, he, Coates, would buy and take off Poe's hands at par, one hundred and ten shares of said stock; and whether the contingency contemplated by them has ever happened is the subject of this controversy.

Now let us see, if we can, from the contract, and all the facts and circumstances in evidence in the case, what was in the mind of each of these parties at the time the contract was made, in reference thereto, and we may

then be enabled to determine the true meaning of the terms employed in said written contract. And first, as to Coates, he was the leading spirit in getting up the company, in organizing the enterprise, and became its president as soon as the company was organized ; he wanted the capital stock of the company to be one hundred thousand dollars ; he and his associates succeeded in getting seventy thousand subscribed, and wanted to get the remaining thirty thousand dollars taken. For this purpose, he and two of his associates went as a committee to St. Louis, to get that remainder taken, if possible, by a St. Louis transportation company ; failing in this, they waited on Poe ; now what was in the minds of Coates and his associates in relation to Poe when they went to him ? Evidently Poe's employment, his boat and his barges did not occupy the first place in their minds, for it was only after they failed to get the transportation company to take the stock that they sought an interview with Poe ; to get the unsubscribed stock taken was the first and paramount object of their visit; their labors in the venture thus far, had been to get one hundred thousand dollars subscribed ; they had succeeded in getting seventy thousand dollars, but had failed to get the remainder taken in the quarter they expected, and this was the necessary next step, without which their previous exertions were fruitless, and the enterprise must fail. They went to Poe, knowing from his previous proposal, that he had a steamboat that he wanted to use in such an enterprise, and that he knew where some barges could be procured. They knew also the value he placed upon his boat, and that he was willing to take stock in such a company with a capital of fifty thousand dollars, to the amount of nineteen thousand dollars, the value he placed upon his boat. With this knowledge, and with their venture in this condition, the primary and paramount consideration in the mind of Coates and his associates at the time must have been to get Poe to take the remain-

ing thirty thousand dollars; the other arrangements with him, were to them, of subordinate importance.

Now, how was it with Poe, who, it would appear, from the evidence, was a steamboat captain? He owned the steamboat "Fearless," which he valued at nineteen thousand dollars; it does not appear that he owned anything else; he was desirous of employing himself and his boat in a like venture with that which Coates and his associates were endeavoring to set on foot; he had learned of their movements in that direction, had made the written proposal spoken of, and had received no response thereto, except that nothing could be done by Coates, until he had consulted with his associates; evidently anxious, however, to engage in the business, he had made a contract (what kind and with whom does not appear) for the three barges mentioned in the written contract, and at the time he was visited by Coates and his associates, the thought that was uppermost in his mind must have been to get himself, his boat, and barges engaged in the business in which all the parties were desirous of engaging. Thus we find that when they set about fixing the terms of their agreement, the leading thought in the mind of Coates was to get the thirty thousand dollars subscribed; the leading thought in the mind of Poe to get employment for himself, his boat and barges in the line of his vocation, and to that end he was willing to invest all his means, which consisted only of his steamboat. Coates was willing to buy Poe's boat at his price, take the barges off his hands, and employ him as commander of the fleet at a reasonable compensation. Poe was willing to sell his boat, transfer the barges, take an amount of stock equal to the value of his boat (190 shares) and enter into the employment of the company, and in all these matters their minds ran smoothly together, and into the contract; but there was one matter of primary importance in Coates' mind, but of none in the mind of Poe, upon which their minds did not

and could not run together, which created an obstacle that must be removed before that *consensus* could take place of which this written contract was born, and that was the inability of Poe to take the additional one hundred and ten shares of stock to make up the whole amount of the proposed capital stock.

Poe had nothing but his boat; its value was the measure of his ability to subscribe stock. He had not a dollar, so far as the evidence discloses, to back or protect a subscription for a single share beyond its value. If he subscribed for one hundred and ninety shares of stock, the value of his boat was equal to the par value of that amount of the stock, and he could reasonably expect that he would be able to meet all calls that might be made on his stock. If, however, he subscribed for three hundred shares, he knew that a call of fourteen per cent. on the balance due on his stock, after the first payment of fifty per cent., would exhaust his resources, and that, after meeting such call of fourteen per cent., he would be unable to meet any subsequent call, failing in which, his entire stock might be forfeited and his whole investment lost; this situation of Poe's was palpable to all parties. How was it to be relieved? That it should be relieved was necessary to the consummation of the contract; to furnish that relief was evidently the intention of the parties, in inserting that clause in the contract, the meaning of which we are seeking to find. To afford that relief it was necessary that some one should be ready to take the one hundred and ten shares to be subscribed for by Poe, more than he was able to carry, off his hands whenever he was unable to meet the calls on the three hundred shares of stock; his ability to meet which he might well doubt, since the payment of fifty per cent. on so large an amount of stock left him but small margin to meet any subsequent calls; if he took only the one hundred and ninety shares, as he contemplated, after paying fifty per cent. cash, he would

have ninety-five hundred dollars to meet subsequent calls and to protect his nineteen thousand dollars of stock; if, on the other hand, he subscribed for three hundred shares, as he was desired to do, he would, after paying fifty per cent. cash, have only four thousand dollars left to meet subsequent calls on, and to protect thirty thousand dollars of stock. In this situation Poe, by subscribing for thirty thousand dollars of stock, hazarded everything he had; he was evidently willing to subject his all to the hazards incident to the venture, but was not willing, and could not have intended to subject his all to the additional hazard of losing it by reason of his possible inability to meet calls upon this large subscription, so much beyond his means, a risk imminent by reason of the necessary exhaustion of his resources in meeting the first payment of fifty per cent. and any small call that might be made thereafter.

What he needed was indemnity for incurring this additional risk. It was just as great, and needed to be provided for just as much, if the remainder due on his stock should be called for, for any other legitimate purpose, as if called for, for the purpose of increasing the transportation facilities of the company, and to furnish this indemnity was the evident purpose of Coates' covenant in the agreement; to accomplish that purpose, Coates must take Poe's stock at par whenever a legitimate call is made for the whole, or any part, of the balance of his subscription, and Poe is unable to meet it, else Poe is subjected to the hazard of losing, not only the amount he may pay on the one hundred and ninety shares, but also all he may pay on the one hundred and ten shares, and will lose the amount paid on both, not because of the hazards of the venture, but because he rendered himself unable to meet the calls upon either, by exhausting the resources he otherwise might have had, in paying calls upon the latter. Looking to the whole contract in the light of all the facts and circum-

stances, and having regard to the parties, the relation
they sustained to each other, and the subject-matter of
the contract, the conclusion is irresistibly forced upon
our minds that the phrase in the written contract,
"when required for increasing the transportation facili-
ties aforesaid," was not only not intended to be limited
to mean "adding another fleet, or materially increasing
their carrying capacity," but was not intended even to be
a condition of Coates' liability.

There was no evidence tending to show that the par-
ties, by the use of that phrase, meant "adding another
fleet, or in some way materially increasing their carry-
ing capacity," except the parol declaration of Coates, in
his testimony, in effect, that such was the intention of
the parties, and some loose talk at the interview, which
resulted in the signing of the contract, about another
fleet, which should have been disregarded by the court
in construing the contract, and which has not entered
into our consideration in endeavoring to ascertain the
intention of the parties, and the true meaning thereof.
But for the view of the court below, that such was the
meaning to be attributed to the words, "when required
for increasing the transportation facilities aforesaid,"
the court would, doubtless, have held, and would have
been warranted in so holding, that, conceding those
words did have the effect of creating a condition upon
which Coates' liability depended, yet, on the evidence,
that condition had been satisfied.   One steamboat and
three barges were the only facilities for transportation
provided for in the contract.   These were immediately
(even before the stock certificates were issued) increased
by the addition of two more barges to the fleet, necessi-
tating a cash payment by Poe of five per cent. more on
his capital stock of thirty thousand dollars than was
contemplated when the contract was signed; and,
although he was able to, and did, pay that additional
call, he was, by its payment, made less able to pay the

Lewis v. Coates.

subsequent call of twelve per cent., and, when that call was made, it is admitted that (Poe having died in the meantime) his administrator had nothing with which to meet it, and that call, though ostensibly made for the payment of indebtedness incurred in the course of the business, that indebtedness must, in the very nature of things, have been incurred for the purpose of increasing, in some way, the transportation facilities of the company, so that the inability of Poe's administrator to pay the call of twelve per cent. was an inability of Poe to pay the remainder of fifty per cent. on his stock, or any part thereof, when required, "for increasing the transportation facilities" of the company, and Coates became liable, conceding that the words, "when required for increasing the transportation facilities aforesaid," should be construed to be a condition of Coates' liability. In any view that we take of this case, the finding of the court was, in our opinion, against the evidence, and, for the reasons hereinbefore stated, we think the court erred in giving the declaration of law on its own motion, and in modifying plaintiff's instruction number four.

The finding of the court, on the evidence, ought to have been for the plaintiff, and his damages assessed at the amount Poe paid on the one hundred and ten shares of stock which he was induced to take by reason of Coates' covenant, but was unable to pay for, which amount was $6,050, being fifty-five per cent. on $11,000, less $5.50, the amount realized by the administrator on the sale of the stock, leaving a balance of $6,044.50, for which plaintiff should have had judgment.

The judgment is reversed and the cause remanded. All concur, except Black, J., who dissents.