# JAVINS *v.* UNITED STATES.

CRIMINAL LAW; GAME LAWS; EVIDENCE.

The possession by a person in the District of a partridge or quail during the close season prescribed by the act of Congress of June 15, 1878 (20 Stat. 134), is a violation of that act, whether such bird was taken or killed beyond the limits of the District or not.

No. 707. Submitted October 5, 1897. Decided November 1, 1897.

HEARING on an appeal by a defendant indicted and convicted of violating the game laws. *Affirmed.*

The facts are sufficiently stated in the opinion.

*Mr. Arthur A. Birney* for the appellant.

*Mr. Henry E. Davis,* U. S. Attorney for the District of Columbia, and *Mr. D. W. Baker,* Assistant Attorney, for the United States.

Mr. Chief Justice ALVEY delivered the opinion of the Court:

The appellants in this case were indicted as Charles H. Javins, John F. Javins and Frank H. Javins, otherwise called Francis H. Javins, all of the District of Columbia, for that, *on the 16th day of March,* 1897, they had *in their possession,* and exposed to sale, six dead partridges, otherwise called quails, against the form of the statute, etc.

The presentment or indictment was found under section 1 of the act of Congress of June 15, 1878, chapter 213, entitled "An act for the preservation of game and protection of birds in the District of Columbia." The appellants pleaded the general issue of not guilty, and upon the evidence and under the instruction of the court, the jury found the appellants guilty, and the court thereupon imposed the

penalty prescribed by the statute.  It is from that judgment that this appeal is taken.

Section 1 of the act under which the indictment was found provides, "that no person shall kill or expose for sale, or *have in either his or her possession, either dead or alive,* any partridge, otherwise quail, between the 1st day of February and the 1st day of November, under a penalty of five dollars for each bird so killed or *in possession.*"

The Government proved that the appellants, as partners and dealers in game and fish at the Center Market, in the city of Washington, had, on March 16, 1897, in their possession, at their place of business, and exposed for sale, one partridge, otherwise quail; and thereupon rested its case. The appellants then gave evidence to prove that the partridges, otherwise quails, were shipped to them with other quails *in regular course of trade* from Illinois or Missouri, a few days prior to the 16th day of March, 1897, and were not killed in the District of Columbia; and the appellants thereupon rested their case.  And no other evidence being offered by either side, the appellants severally prayed the court to instruct the jury—

First—"That if the birds found in the possession of the defendants were not killed, entrapped or taken in the District of Columbia, then they should render a verdict for the defendants;

Second—"That if the bird offered for sale, or found in the possession of the defendants, was not killed, entrapped or taken in the District of Columbia, but was shipped to the defendants from without said District, they should render a verdict for the defendants;

Third—"That unless the jury should find beyond a reasonable doubt that the birds in question were killed in the District of Columbia, the defendants should be acquitted."

The court refused these prayers for instruction, and directed the jury that the evidence offered by the defendants was immaterial, and constituted no defence to the indict

ment. To which ruling the appellants excepted; and the verdict and judgment being against them, they have appealed.

It being conceded that the birds were taken or killed beyond the limits of this District, the question is, whether the parties having them in possession in this District for sale, have incurred the penalty prescribed by the statute?

The fact that the birds were taken or killed in one of the States of the Union and brought into this District for sale, in the regular course of trade, does not furnish the possessors of such game birds immunity from the penalty prescribed by the statute, upon any principle of interstate commerce involved. *Geer* v. *Connecticut*, 161 U. S. 519. Congress, under the Constitution, possessing plenary legislative power over this District, may pass laws for the full and complete protection and preservation of all game birds or other animals *feræ naturæ* therein; and whatever may be the natural right of man in such wild creatures when captured and reduced to possession, such right may be restrained by positive laws enacted for reasons of state or for the supposed benefit of the community. 2 Bl. Com. 410; *Geer* v. *Connecticut, supra.* All civilized nations, from the earliest time, have enacted and enforced game laws, for the protection of game in which there was a common right against wasteful and indiscriminate destruction. Laws of this character, of more or less strictness, are found upon the statute books of England, and of most, if not all, of the States of this Union; and at no time has there been greater need of such laws, and their enforcement, than at the present time; for it is a known fact that our game and insectivorous birds are being rapidly exterminated. In order to prevent evasion of the law, and as a certain means of accomplishing the desired end, many of the game laws make it a substantive offence for a party, within the time and territory prescribed, to have in his possession, either dead or alive, any of the birds or animals sought to be protected. Otherwise the difficulty of

proving the time and place of taking or killing such game would effectually defeat the operation of the law. Indeed, in a small territory, such as this District, it would be impossible to protect the birds, if they could be killed or taken on the exterior border to be brought into the District. The only effectual way of dealing with the subject is to prohibit the possession of the birds within the District, and that is entirely within the power of Congress.

In this case the whole question is one of construction. The terms of the statute are clear and unambiguous. The killing, or offering for sale, of any of the birds specified is prohibited; and also the having in possession, either dead or alive, any partridge, otherwise quail, within this District between the 1st of February and the 1st of November, renders the party liable to a penalty of five dollars. The contention is, that this provision of the statute does not apply to birds killed or taken beyond the limits of the District of Columbia. But to this contention we can not assent.

This same contention has been urged in many of the States whose game laws are similar to the one under consideration; and while in some few States the construction would seem to be variant, and give sanction to the contention urged, the decided preponderance of judicial opinion is against such contention. And this would seem to be supported both upon reason and sound policy. Indeed, the act of Congress under consideration would seem to furnish the key to its own proper construction, if such were needed, by the provision of the fourteenth section, which declares: "That persons in killing birds for *scientific purposes* or *in possession of them for breeding,* shall be exempt from the operation of this act, *by proving affirmatively such purposes; and the possession shall, in all cases, be presumptive evidence of unlawful purpose.*" This exceptional purpose, therefore, is in all cases to be proved by the defendant; and in the absence of such affirmative proof, the presumption *is conclusive* of the unlawful purpose of the possession.

As showing the interpretation of statutes similar to that under consideration, by State courts, we shall refer to a few of those decisions, and which are referred to in *Geer* v. *Connecticut, supra,* with apparent approval.

The first of such decisions to which we shall refer is *Phelps* v. *Racey,* 60 N. Y. 10, where the statute declared that no person should expose for sale, or kill, or *have in his possession* after it had been killed, any quail or other game, between the 1st of January and the 20th of October. The defendant was indicted for having quail in his possession in March. He had invented an apparatus to preserve game, and that which he had in his possession, and specified in the indictment, according to his proof, was killed in New York in the open season, or received from Minnesota, or Illinois, where the killing at the time was legal, and put up by him in his apparatus in the month of December. This, to say the least of it, was a questionable defence, and such as to justify, upon principles of policy, the entire exclusion of it. It was contended that the statute did not apply to game so received and preserved. But it was held otherwise by the Court of Appeals; and in an opinion of the court, delivered by Church, Chief Justice, it was said: "The language of these sections is plain and unambiguous; hence there is no room for construction. It is a familiar rule that when the language is clear, courts have no discretion but to adopt the meaning which it imports. The mandate is, that 'any person having in his or her possession' between certain dates, certain specified game killed, shall be liable to a penalty. The time when, or the place where, the game was killed, or when brought within the State, or where from, is not made material by the statute, and we have no power to make it so. . . . That it was either killed within the lawful period, or brought from another State where the killing was lawful, constitutes no defence. The penalty is denounced against the selling or possession after that time, irrespective of the time or place of killing."

The same principle was applied in the construction of the game law of the State of Illinois of 1879, which made it unlawful to sell; or have in possession, quail and certain other game birds, during the close season, and which was not in terms limited to birds taken within the State. In the case of *Magner* v. *People*, 97 Ill. 323, Scholfield, J., in delivering the opinion of the court, said: "We think it is obvious that the prohibition of all possession and sales of such wild fowls or birds during the prohibited seasons would tend to their protection, in excluding the opportunity for the evasion of such law by clandestinely taking them, when secretly killed or captured here, beyond the State, and afterward bringing them into the State for sale, or by other subterfuges and evasions. It is quite true that the mere act of allowing a quail netted in Kansas to be sold here does not injure, or in any wise affect the game here, but a law which renders all sales and all possessions unlawful will more certainly prevent any possession or any sale of the game within the State than will a law allowing possession or sale here of the game taken in other States. This is but one among many instances to be found in the law where acts, which in and of themselves alone are harmless enough, are condemned because of the facility they otherwise afford for a cover or disguise for the doing of that which is harmful." The same principle and reasoning were adopted and followed in the subsequent case of the *American Express Co.* v. *People*, 133 Ill. 649, arising under the amended game law of Illinois of 1889.

Similar constructions of game laws of like import have been adopted in Ohio in the case of *Roth* v. *State*, 51 Ohio St. 209, and in Missouri in the cases of *State* v. *Randolph*, 1 Mo. App. 15, and *State* v. *Farrell*, 93 Mo. 176. And in the State of California, in a full and well reasoned opinion by the Supreme Court of that State, in the case of *Ex parte Maier*, 103 Cal. 476, the same construction was fully adopted. In that case it was held that the State, in the exercise of the

police power, could prohibit the taking of wild game and any traffic or commerce therein, if deemed necessary for its protection or preservation, or the public good, and to this end could make it criminal for any person to sell, or offer for sale, any of such game, whether killed within or without the State.

It is true, there are several States in which a different construction would seem to prevail, though made of statutes somewhat different in terms from the statute here involved. This appears in *Com.* v. *Hall,* 128 Mass. 410; *Com.* v. *Wilkinson,* 139 Pa. St. 304; *State* v. *McGuire,* 24 Oregon, 366; *Dickhaut* v. *State* (Md.), 37 Atl. Rep. 21. These cases, however, do not appear to be supported by such weight of argument as to countervail and require to be disregarded the cases holding a contrary doctrine.

In this case, as we have said, the words of the statute are plain and unambiguous, and that being so, Congress must be intended to mean what the language employed plainly expresses, and consequently there is no room for construction. The court is not at liberty to read into the statute an exception to the general and unqualified provision, there being no such exception expressed, and where, indeed, by clear implication, such exception is excluded.

This question of the unqualified application of the terms of a game law to game killed beyond the limits of the country enacting the law and brought within the country, arose in the courts of England, and was decided in the case of *Whitehead* v. *Smithers,* 2 Com. Pl. Div. 553. In that case the question was raised upon two acts of Parliament passed for the protection of wild fowl, viz., 35 and 36 Vict., C. 78, and 39 and 40 Vict., C. 29. By Section 2 of the first-mentioned act, it was enacted that any person who should kill or take any wild bird, or expose or offer for sale any wild bird recently killed or taken between the 15th of March and the 1st of August, should incur a penalty of 5s., "unless he should prove to the satisfaction of the justice that the

bird was bought or received on or before the 15th of March, or of or from some person residing out of the United Kingdom." Under that statute it was an answer to an information if the person charged could prove that the bird which he exposed or offered for sale was bought or received by him of or from some person residing out of the United Kingdom. But that act failed to accomplish the purpose of the legislature, and deeming it necessary to pass a more stringent and less qualified act, the act of 39 and 40 Vict. was passed; and after reciting that the protection accorded by the preceding act of 1872 was found to be insufficient, the last act enacted "that any person who shall kill or take, or *shall have in his control or possession,* any wild fowl recently killed or taken, between the 15th of February and the 10th of July, shall, on conviction, forfeit and pay for every such wild fowl so killed, etc., or *so in his possession,* not exceeding £1." In that case it was urged that, inasmuch as the second act did not in terms repeal the first act, and the second act made no mention of wild fowl killed or transported from beyond the limits of the United Kingdom, the two acts should be read together, and consequently, it having been proved that the plover in question was bought by the defendant of a person residing in Holland, that was an answer to an information under the latter act. But the court held otherwise, and, in the opinion delivered by Lord Chief Justice Coleridge, he said: "It is said that it would be a strong thing for the legislature of the United Kingdom to interfere with the right of foreigners to kill foreign birds. But it may well be that the true and only mode of protecting British wild fowl from indiscriminate slaughter, as well as of protecting other British interest, is by interfering indirectly with the proceedings of foreign persons. The object is to prevent British wild fowl from being improperly killed and sold under pretence of their being imported from abroad. It has been said that the second statute can not be held to operate as a repeal of the first, because there is

no contrariety or repugnancy in the two acts. The act of 1876, however, refers in terms to the act of 1872, and declares that the protection afforded by it to the wild birds was insufficient, and that it is expedient to provide further for their protection." And this was done, as we have seen, by omitting from the last act the exception contained in the first, allowing birds to be brought into the Kingdom from foreign parts, and prohibiting their possession in the Kingdom during the prescribed period. This was found in England to be the only effectual mode of protecting the birds within the Kingdom; and that mode has been adopted by the act of Congress which we have considered.

It follows that the judgment of the court below must be affirmed. And it is so ordered.

*Judgment affirmed.*