## GEER *v.* CONNECTICUT.

ERROR TO THE SUPREME COURT OF ERRORS OF THE STATE OF CONNECTICUT.

No. 87. Argued November 22, 1895. — Decided March 2, 1896.

The provision in the General Statutes of Connecticut, (Revision of 1888, § 2546,) that "no person shall at any time kill any woodcock, ruffled grouse or quail for the purpose of conveying the same beyond the limits of this State; or shall transport or have in possession, with intent to procure the transportation beyond said limits, any of such birds killed within this State," is legislation which it is within the constitutional power of the legislature of the State to enact.

THE General Statutes of the State of Connecticut provide (Sec. 2530, Revision of 1888):

"Every person who shall buy, sell, expose for sale, or have in his possession for any purpose, or who shall hunt, pursue, kill, destroy or attempt to kill any woodcock, quail, ruffled grouse, called partridge, or gray squirrel, between the first day of January and the first day of October, the killing or having in possession of each bird or squirrel to be deemed a separate offence, . . . shall be fined not more than twenty-five dollars. . . . "

It is further by the statute of the same State provided (Sec. 2546):

"No person shall at any time kill any woodcock, ruffled grouse or quail for the purpose of conveying the same beyond the limits of this State; or shall transport or have in possession, with intent to procure the transportation beyond said limits, any of such birds killed within this State. The reception by any person within this State of any such bird or birds for shipment to a point without the State shall be *prima facie* evidence that said bird or birds were killed within the State for the purpose of carrying the same beyond its limits."

An information was filed against the plaintiff in error in the police court of New London, Connecticut, charging him

with, on the 19th day of October, 1889, unlawfully receiving and having in his possession, with the wrongful and unlawful intent to procure the transportation beyond the limits of the State certain woodcock, ruffled grouse and quail killed within this State after the first day of October, 1889. The trial of the charge resulted in the conviction of the defendant and the imposing of a fine upon him. Thereupon the case was taken by appeal to the criminal court of Common Pleas. In that court the defendant demurred to the information on the ground, among others, that the statute upon which that prosecution was based violated the Constitution of the United States.

The demurrer being overruled, and the defendant declining to answer over, he was adjudged guilty and condemned to pay a fine and costs, and to stand committed until he had complied with the judgment. An appeal was prosecuted to the Supreme Court of Errors of the State. The defendant on the appeal assigned the following errors:

"The court erred —

"1st. In holding that the allegations contained in the complaint constitute an offence in law.

"2d. In holding that said complaint was insufficient in the law without an allegation that the birds therein mentioned were killed in this State for the purpose of conveying the same beyond the limits of this State.

"3d. In refusing to hold that so much of section 2546 of the General Statutes, under which this complaint is brought, as may be construed to forbid the transportation from this State of the birds therein described, lawfully killed and permitted by the laws of the State to become the subject of traffic and commerce, is unconstitutional and void.

"4th. In refusing to hold that so much of said section as may be construed to forbid the receiving and having in possession, with intent to procure the transportation thereof to another State, birds therein described, lawfully killed and permitted by the laws of this State to become the subject of traffic and commerce, is unconstitutional and void.

"5th. In holding that the defendant is guilty of an offence

under said section if such birds were lawfully killed in this State and were bought by the defendant in the markets of this State as articles of property, merchandise and commerce, and had begun to move as an article of interstate commerce.

"6th. In not rendering judgment for defendant."

In the Supreme Court the conviction was affirmed. The case is reported in 61 Connecticut, 144. To this judgment of affirmance this writ of error is prosecuted.

*Mr. Hadlai A. Hull* for plaintiff in error.

*Mr. Solomon Lucas* for defendant in error.

MR. JUSTICE WHITE, after stating the case, delivered the opinion of the court.

By the statutes of the State of Connecticut, referred to in the statement of facts, the open season for the game birds mentioned therein was from the first day of October to the first day of January. The birds which the defendant was charged with unlawfully having in his possession on the 19th of October, for the purpose of unlawful transportation beyond the State, were alleged to have been killed within the State after the first day of October. They were, therefore, killed during the open season. There was no charge that they had been unlawfully killed for the purpose of being transported outside of the State. The offence, therefore, charged was the possession of game birds, for the purpose of transporting them beyond the State, which birds had been lawfully killed within the State. The court of last resort of the State held, in interpreting the statute already cited, by the light afforded by previous enactments, that one of its objects was to forbid the killing of birds within the State during the open season for the purpose of transporting them beyond the State, and also additionally as a distinct offence to punish the having in possession, for the purpose of transportation beyond the State, birds lawfully killed within the State. The court found that the information did not charge the first of these offences, and therefore that the sole offence which it covered was the lat-

ter. It then decided that the State had power to make it an offence to have in possession, for the purpose of transportation beyond the State, birds which had been lawfully killed within the State during the open season; and that the statute in creating this offence did not violate the interstate commerce clause of the Constitution of the United States. The correctness of this latter ruling is the question for review. In other words, the sole issue which the case presents is, was it lawful under the Constitution of the United States (section 8, Article I) for the State of Connecticut to allow the killing of birds within the State during a designated open season, to allow such birds, when so killed, to be used, to be sold and to be bought for use within the State, and yet to forbid their transportation beyond the State? Or, to state it otherwise, had the State of Connecticut the power to regulate the killing of game within her borders so as to confine its use to the limits of the State and forbid its transmission outside of the State?

In considering this inquiry we of course accept the interpretation affixed to the state statute by the court of last resort of the State. The solution of the question involves a consideration of the nature of the property in game and the authority which the State had a right lawfully to exercise in relation thereto.

From the earliest traditions the right to reduce animals *feræ naturæ* to possession has been subject to the control of the law-giving power.

The writer of a learned article in the Répertoire of the Journal du Palais mentions the fact that the law of Athens forbade the killing of game, (Rep. Gen. J. P. vol. 5, p. 307,) and Merlin says (Répertoire de Jurisprudence, vol. 4, p. 128) that "Solon, seeing that the Athenians gave themselves up to the chase, to the neglect of the mechanical arts, forbade the killing of game.

Among other subdivisions, things were classified by the Roman law into public and common. The latter embraced animals *feræ naturæ*, which, having no owner, were considered as belonging in common to all the citizens of the State. After pointing out the foregoing subdivision, the Digest says:

"There are things which we acquire the dominion of, as by the law of nature, which the light of natural reason causes every man to see, and others we acquire by the civil law, that is to say, by methods which belong to the government. As the law of nature is more ancient, because it took birth with the human race, it is proper to speak first of the latter. 1. Thus, all the animals which can be taken upon the earth, in the sea, or in the air, that is to say, wild animals, belong to those who take them. . . . Because that which belongs to nobody is acquired by the natural law by the person who first possesses it. We do not distinguish the acquisition of these wild beasts and birds by whether one has captured them on his own property or on the property of another; but he who wishes to enter into the property of another to hunt can be readily prevented if the owner knows his purpose to do so." Digest, Book 41, Tit. 1, De Adquir. Rer. Dom.

No restriction, it would hence seem, was placed by the Roman law upon the power of the individual to reduce game, of which he was the owner in common with other citizens, to possession, although the Institutes of Justinian recognized the right of an owner of land to forbid another from killing game on his property, as indeed this right was impliedly admitted by the Digest in the passage just cited. Institutes, Book 2, Tit. 1, s. 12.

This inhibition was, however, rather a recognition of the right of ownership in land than an exercise by the State of its undoubted authority to control the taking and use of that which belonged to no one in particular, but was common to all. In the feudal as well as the ancient law of the continent of Europe, in all countries, the right to acquire animals *feræ naturæ* by possession was recognized as being subject to the governmental authority and under its power, not only as a matter of regulation, but also of absolute control. Merlin, *ubi. sup.* mentions the fact that, although tradition indicates that from the earliest day in France, every citizen had a right to reduce a part of the common property in game to ownership by possession, yet it was also true that as early as the Salic law that right was regu-

lated in certain particulars. Pothier in his treatise on Property speaks as follows :

"In France, as well as in all other civilized countries of Europe, the civil law has restrained the liberty which the pure law of nature gave to every one to capture animals who, being *in naturali laxitate*, belong to no person in particular. The sovereigns have reserved to themselves, and to those to whom they judge proper to transmit it, the right to hunt all game, and have forbidden hunting to other persons. Some ancient doctors have doubted if sovereigns had the right to reserve hunting to themselves and to forbid it to their subjects. They contend that as God has given to man dominion over the beasts, the prince had no authority to deprive all his subjects of a right which God had given them. The natural law, say they, permitted hunting to each individual. The civil law which forbids it is contrary to the natural law and exceeds, consequently, the power of the legislator, who, being himself submitted to the natural law, can ordain nothing contrary to that law. It is easy to reply to these objections. From the fact that God has given to human kind dominion over wild beasts, it does not follow that each individual of the human race should be permitted to exercise this dominion. The civil law it is said cannot be contrary to the natural law. This is true as regards those things which the natural law commands or which it forbids; but the civil law can restrict that which the natural law only permits. The greater part of all civil laws are nothing but restrictions on those things which the natural law would otherwise permit. It is for this reason, although by the pure law of nature, hunting was permitted to each individual, the prince had the right to reserve it in favor of certain persons and forbid it to others. Pothier, Traité du Droit de Propriété, Nos. 27–28.

"The right belongs to the king to hunt in his dominion; his quality of sovereign gives him the authority to take possession above all others of the things which belong to no one, such as wild animals; the lords and those who have a right to hunt hold such right but from his permission, and he can affix to this permission such restrictions and modifications as may seem to him good." No. 32.

In tracing the origin of the classification of animals *feræ naturæ*, as things common, Pothier moreover says :

"The first of mankind had in common all those things which God had given to the human race. This community was not a positive community of interest, like that which exists between several persons who have the ownership of a thing in which each has his particular portion. It was a community, which those who have written on this subject have called a negative community, which resulted from the fact that those things which were common to all belonged no more to one than to the others, and hence no one could prevent another from taking of these common things that portion which he judged necessary in order to subserve his wants. Whilst he was using them others could not disturb him, but when he had ceased to use them, if they were not things which were consumed by the fact of use, the things immediately reëntered into the negative community, and another could use them. The human race having multiplied, men partitioned among themselves the earth and the greater part of those things which were on its surface. That which fell to each one among them commenced to belong to him in private ownership, and this process is the origin of the right of property. Some things, however, did not enter into this division, and remain therefore to this day in the condition of the ancient and negative community." No. 21.

Referring to those things which remain common, or in what he qualified as the negative community, this great writer says :

"These things are those which the jurisconsults called *res communes*. Marcien refers to several kinds — the air, the water which runs in the rivers, the sea and its shores. . . . As regards wild animals, *feræ naturæ*, they have remained in the ancient state of negative community."

In both the works of Merlin and Pothier, *ubi sup.*, will be found a full reference to the history of the varying control exercised by the law-giving power over the right of a citizen to acquire a qualified ownership in animals, *feræ naturæ*, evidenced by the regulation thereof by the Salic law, already

referred to, exemplified by the legislation of Charlemagne, and continuing through all vicissitudes of governmental authority. This unbroken line of law and precedent is summed up by the provisions of the Napoleon Code, which declare (arts. 714, 715): "There are things which belong to no one, and the use of which is common to all. Police regulations direct the manner in which they may be enjoyed. The faculty of hunting and fishing is also regulated by special laws." Like recognition of the fundamental principle upon which the property in game rests has led to similar history and identical results in the common law of Germany, in the law of Austria, Italy, and, indeed, it may be safely said in the law of all the countries of Europe. Saint Joseph Concordance, vol. 1, p. 68.

The common law of England also based property in game upon the principle of common ownership, and therefore treated it as subject to governmental authority.

Blackstone, whilst pointing out the distinction between things private and those which are common, rests the right of an individual to reduce a part of this common property to possession, and thus acquire a qualified ownership in it, on no other or different principle from that upon which the civilians based such right. 2 Bl. Com. 1 and 12.

Referring especially to the common ownership of game, he says:

"But after all, there are some few things which, notwithstanding the general introduction and continuance of property, must still unavoidably remain in common, being such wherein nothing but an usufructuary property is capable of being had; and therefore they still belong to the first occupant during the time he holds possession of them and no longer. Such (among others) are the elements of light, air and water, which a man may occupy by means of his windows, his gardens, his mills and other conveniences; such also are the generality of those animals which are said to be *feræ naturæ* or of a wild and untamable disposition, which any man may seize upon and keep for his own use or pleasure." 2 Bl. Com. 14.

"A man may lastly have a qualified property in animals

*feræ naturæ, propter privilegium,* that is, he may have the privilege of hunting, taking and killing them in exclusion of other persons. Here he has a transient property in these animals usually called game so long as they continue within his liberty, and may restrain any stranger from taking them therein; but the instant they depart into another liberty, this qualified property ceases. . . . A man can have no absolute permanent property in these, as he may in the earth and land; since these are of a vague and fugitive nature, and therefore can admit only of a precarious and qualified ownership, which lasts so long as they are in actual use and occupation, but no longer." 2 Bl. Com. 394.

In stating the existence and scope of the royal prerogative, Blackstone further says:

"There still remains another species of prerogative property, founded upon a very different principle from any that have been mentioned before; the property of such animals, *feræ naturæ,* as are known by the denomination of *game,* with the right of pursuing, taking and destroying them; which is vested in the king alone and from him derived to such of his subjects as have received the grants of a chase, a park, a free warren or free fishery. . . . In the first place then, we have already shown, and indeed it cannot be denied, that by the law of nature every man from the prince to the peasant has an equal right of pursuing and taking to his own use all such creatures as are *feræ naturæ,* and, therefore, the property of nobody, but liable to be seized by the first occupant, and so it was held by the imperial law even so late as Justinian's time. . . . But it follows from the very end and constitution of society that this natural right as well as many others belonging to a man as an individual may be restrained by positive laws enacted for reasons of state or for the supposed benefit of the community." 2 Bl. Com. 410.

The practice of the government of England from the earliest time to the present has put into execution the authority to control and regulate the taking of game.

Undoubtedly this attribute of government to control the taking of animals *feræ naturæ,* which was thus recognized and

enforced by the common law of England, was vested in the colonial governments, where not denied by their charters, or in conflict with grants of the royal prerogative. It is also certain that the power which the colonies thus possessed passed to the States with the separation from the mother country, and remains in them at the present day, in so far as its exercise may be not incompatible with, or restrained by, the rights conveyed to the Federal government by the Constitution. Kent, in his Commentaries, states the ownership of animals *feræ naturæ* to be only that of a qualified property. 2 Kent Com. 347. In most of the States laws have been passed for the protection and preservation of game. We have been referred to no case where the power to so legislate has been questioned, although the books contain cases involving controversies as to the meaning of some of the statutes. *Commonwealth* v. *Hall*, 128 Mass. 410; *Commonwealth* v. *Wilkinson*, 139 Penn. St. 304; *People* v. *O'Neil*, 71 Michigan, 325. There are also cases where the validity of some particular method of enforcement provided in some of the statutes has been drawn in question. *Kansas* v. *Saunders*, 19 Kansas, 127; *Territory* v. *Evans*, 2 Idaho, 634.

The adjudicated cases recognizing the right of the States to control and regulate the common property in game are numerous. In *McCrady* v. *Virginia*, 94 U. S. 395, the power of the State of Virginia to prohibit citizens of other States from planting oysters within the tide waters of that State was upheld by this court. In *Manchester* v. *Massachusetts*, 139 U. S. 24, the authority of the State of Massachusetts to control and regulate the catching of fish within the bays of that State was also maintained. See also *Phelps* v. *Racey*, 60 N. Y. 10; *Magner* v. *People*, 97 Illinois, 320; *American Express Co.*, v. *People*, 133 Illinois, 649; *State* v. *Northern Pacific Express Co.*, 58 Minnesota, 403; *State* v. *Rodman*, 58 Minnesota, 393; *Ex parte Maier*, 103 California, 476; *Organ* v. *State*, 56 Arkansas, 267, 270; *Allen* v. *Wyckoff*, 48 N. J. Law, 90, 93; *Roth* v. *State*, 51 Ohio St. 209; *Gentile* v. *State*, 29 Indiana, 409, 415; *State* v. *Farrell*, 23 Mo. App. 176, and cases there cited; *State* v. *Saunders, ubi sup.*; *Territory* v. *Evans, ubi sup.*

Whilst the fundamental principles upon which the common property in game rests have undergone no change, the development of free institutions has led to the recognition of the fact that the power or control lodged in the State, resulting from this common ownership, is to be exercised, like all other powers of government, as a trust for the benefit of the people, and not as a prerogative for the advantage of the government, as distinct from the people, or for the benefit of private individuals as distinguished from the public good. Therefore, for the purpose of exercising this power, the State, as held by this court in *Martin* v. *Waddell*, 16 Pet. 410, represents its people, and the ownership is that of the people in their united sovereignty. The common ownership, and its resulting responsibility in the State, is thus stated in a well considered opinion of the Supreme Court of California:

" The wild game within a State belongs to the people in their collective sovereign capacity. It is not the subject of private ownership except in so far as the people may elect to make it so; and they may, if they see fit, absolutely prohibit the taking of it, or traffic and commerce in it, if it is deemed necessary for the protection or preservation of the public good." *Ex parte Maier, ubi sup.*

The same view has been expressed by the Supreme Court of Minnesota, as follows :

" We take it to be the correct doctrine in this country, that the ownership of wild animals, so far as they are capable of ownership, is in the State, not as a proprietor but in its sovereign capacity as the representative and for the benefit of all its people in common." *State* v. *Rodman, ubi sup.*

The foregoing analysis of the principles upon which alone rests the right of an individual to acquire a qualified ownership in game, and the power of the State, deduced therefrom, to control such ownership for the common benefit, clearly demonstrates the validity of the statute of the State of Connecticut here in controversy. The sole consequence of the provision forbidding the transportation of game, killed within the State, beyond the State, is to confine the use of such game to those who own it, the people of that State. The proposition

that the State may not forbid carrying it beyond her limits involves, therefore, the contention that a State cannot allow its own people the enjoyment of the benefits of the property belonging to them in common, without at the same time permitting the citizens of other States to participate in that which they do not own. It was said in the discussion at bar, although it be conceded that the State has an absolute right to control and regulate the killing of game as its judgment deems best in the interest of its people, inasmuch as the State has here chosen to allow the people within her borders to take game, to dispose of it, and thus cause it to become an object of State commerce, as a resulting necessity such property has become the subject of interstate commerce, and is hence controlled by the provisions of article 1, section 8, of the Constitution of the United States. But the errors which this argument involves are manifest. It presupposes that where the killing of game and its sale within the State is allowed, that it thereby becomes commerce in the legal meaning of that word. In view of the authority of the State to affix conditions to the killing and sale of game, predicated as is this power on the peculiar nature of such property and its common ownership by all the citizens of the State, it may well be doubted whether commerce is created by an authority given by a State to reduce game within its borders to possession, provided such game be not taken, when killed, without the jurisdiction of the State. The common ownership imports the right to keep the property, if the sovereign so chooses, always within its jurisdiction for every purpose. The qualification which forbids its removal from the State necessarily entered into and formed part of every transaction on the subject, and deprived the mere sale or exchange of these articles of that element of freedom of contract and of full ownership which is an essential attribute of commerce. Passing, however, as we do, the decision of this question, and granting that the dealing in game killed within the State, under the provision in question, created internal State commerce, it does not follow that such internal commerce became necessarily the subject-matter of interstate commerce, and therefore under the

control of the Constitution of the United States. The distinction between internal and external commerce and inter-state commerce is marked, and has always been recognized by this court. In *Gibbons* v. *Ogden*, 9 Wheat. 1, 194, Mr. Chief Justice Marshall said:

"It is not intended to say that these words comprehend that commerce, which is completely internal, which is carried on between man and man in a State, or between different parts of the same State, and which does not extend to or affect other States. Such a power would be inconvenient and, is certainly unnecessary.

"Comprehensive as the word 'among' is, it may very properly be restricted to that commerce which concerns more States than one. The phrase is not one which would probably have been selected to indicate the completely interior traffic of a State, because it is not an apt phrase for that purpose; and the enumeration of the particular classes of commerce to which the power was to be extended would not have been made, had the intention been to extend the power to every description. The enumeration presupposes something not enumerated; and that something, if we regard the language or the subject of the sentence, must be the exclusively internal commerce of the State. The genius and character of the whole government seem to be that its action is to be applied to all the external concerns of the nation, and to those internal concerns which affect the States generally, but not to those which are completely within a particular State, which do not affect other states, and with which it is not necessary to interfere, for the purpose of executing some of the general powers of the government. The completely internal commerce of a State, then, may be considered as reserved for the State itself."

So, again, in *The Daniel Ball*, 10 Wall. 557, 564, this court, speaking through Mr. Justice Field, said:

"There is undoubtedly an internal commerce which is subject to the control of the States. The power delegated to Congress is limited to commerce 'among the several States,' with foreign nations and with the Indian tribes. This limita-

tion necessarily excludes from the Federal control, commerce not thus designated, and of course that commerce which is carried on entirely within the limits of a State and does not extend to or affect other States."

The fact that internal commerce may be distinct from interstate commerce, destroys the whole theory upon which the argument of the plaintiff in error proceeds. The power of the State to control the killing of and ownership in game being admitted, the commerce in game, which the state law permitted, was necessarily only internal commerce, since the restriction that it should not become the subject of external commerce went along with the grant and was a part of it. All ownership in game killed within the State came under this condition, which the State had the lawful authority to impose, and no contracts made in relation to such property were exempt from the law of the State consenting that such contracts be made, provided only they were confined to internal and did not extend to external commerce.

The case in this respect is identical with *Kidd* v. *Pearson*, 128 U. S. 1. The facts there considered were briefly as follows: The State of Iowa permitted the distillation of intoxicating liquors for "mechanical, medicinal, culinary and sacramental purposes." The right was asserted to send out of the State intoxicating liquors made therein on the ground that, when manufactured in the State, such liquors became the subject of interstate commerce, and were thus protected by the Constitution of the United States; but this court, through Mr. Justice Lamar, pointed out the vice in the reasoning, which consisted in presupposing that the State had authorized the manufacture of intoxicants, thereby overlooking the exceptional purpose for which alone such manufacture was permitted. So here the argument of the plaintiff in error substantially asserts that the state statute gives an unqualified right to kill game, when in fact it is only given upon the condition that the game killed be not transported beyond the state limits. It was upon this power of the State to qualify and restrict the ownership in game killed within its limits that the court below rested its conclusion, and similar views

have been expressed by the courts of last resort of several of the States. In *State* v. *Rodman*, 58 Minnesota, 393, 400, the Supreme Court of Minnesota said:

"The preservation of such animals as are adapted to consumption as food or to any other useful purpose, is a matter of public interest; and it is within the police power of the State, as the representative of the people in their united sovereignty, to make such laws as will best preserve such game, and secure its beneficial use in the future to the citizens, and to that end it may adopt any reasonable regulations, not only as to time and manner in which such game may be taken and killed, but also imposing limitations upon the right of property in such game after it has been reduced to possession. Such limitations deprive no person of his property, because he who takes or kills game had no previous right of property in it, and when he acquires such right by reducing it to possession he does so subject to such conditions and limitations as the legislature has seen fit to impose." See, also, *State* v. *Northern Pacific Express Co.*, 58 Minnesota, 403.

So, also, in *Magner* v. *The People*, 97 Illinois, 320, 333, the Supreme Court of Illinois said:

" So far as we are aware, it has never been judicially denied that the government under its police powers may make regulations for the preservation of game and fish, restricting their taking and molestation to certain seasons of the year, although laws to this effect, it is believed, have been in force in many of the older States since the organization of the Federal Government. . . . The ownership being in the people of the State, the repository of the sovereign authority, and no individual having any property rights to be affected, it necessarily results that the legislature, as the representative of the people of the State, may withhold or grant to individuals the right to hunt and kill game or qualify or restrict, as in the opinions of its members will best subserve the public welfare. Stated in other language, to hunt and kill game is a boon or privilege, granted either expressly or impliedly by the sovereign authority — not a right inherent in each individual, and consequently nothing is taken away from the individual when

he is denied the privilege at stated seasons of hunting and killing game. It is, perhaps, accurate to say that the ownership of the sovereign authority is in trust for all the people of the State, and hence by implication it is the duty of the legislature to enact such laws as will best preserve the subject of the trust and secure its beneficial use in the future to the people of the State. But in any view, the question of individual enjoyment is one of public policy and not of private right."

See also *Ex parte Maier*, 103 California, 476; *Organ* v. *The State*, 56 Arkansas, 270. It is, indeed, true that in *State* v. *Saunders*, 19 Kansas, 127, and *Territory* v. *Evans*, 2 Idaho, 634, it was held that a state law prohibiting the shipment outside of the State of game killed therein violated the interstate commerce clause of the Constitution of the United States, but the reasoning which controlled the decision of these cases is, we think, inconclusive, from the fact that it did not consider the fundamental distinction between the qualified ownership in game and the perfect nature of ownership in other property, and thus overlooked the authority of the State over property in game killed within its confines, and the consequent power of the State to follow such property into whatever hands it might pass with the conditions and restrictions deemed necessary for the public interest.

Aside from the authority of the State, derived from the common ownership of game and the trust for the benefit of its people which the State exercises in relation thereto, there is another view of the power of the State in regard to the property in game, which is equally conclusive. The right to preserve game flows from the undoubted existence in the State of a police power to that end, which may be none the less efficiently called into play, because by doing so interstate commerce may be remotely and indirectly affected. *Kidd* v. *Pearson*, 128 U. S. 1; *Hall* v. *De Cuir*, 95 U. S. 485; *Sherlock* v. *Alling*, 93 U. S. 99, 103; *Gibbons* v. *Ogden*, 9 Wheat. 1. Indeed, the source of the police power as to game birds (like those covered by the statute here called in question) flows from the duty of the State to preserve for its people a valuable food supply. *Phelps* v. *Racey*, 60 N. Y. 10; *Ex parte*

*Maier, ubi sup.; Magner* v. *The People, ubi sup.,* and cases there cited. The exercise by the State of such power therefore comes directly within the principle of *Plumley* v. *Massachusetts,* 155 U. S. 461, 473. The power of a State to protect by adequate police regulation its people against the adulteration of articles of food, (which was in that case maintained,) although in doing so commerce might be remotely affected, necessarily carries with it the existence of a like power to preserve a food supply which belongs in common to all the people of the State, which can only become the subject of ownership in a qualified way, and which can never be the object of commerce except with the consent of the State and subject to the conditions which it may deem best to impose for the public good.

*Judgment affirmed.*

Mr. Justice Field dissenting.

I am unable to agree with the majority of my associates in the affirmance of the judgment of the Supreme Court of Errors of Connecticut in this case, and I will state, briefly, the grounds of my disagreement.

Section 2546 of the statutes of Connecticut, contained in the revision of 1838, enacts that "no person shall, at any time, kill any woodcock, ruffled grouse, or quail, for the purpose of conveying the same beyond the limits of the State; or shall transport, or have in his possession with intent to procure the transportation beyond its limits, of any of such birds killed within the State." And it adds in substance that the reception by any person within the State of any such bird or birds for shipment to a point without the State shall be *prima facie* evidence that the bird or birds were killed within the State for the purpose of carrying the same beyond its limits.

Section 2530 of the statutes provides that every person who shall kill, destroy, or attempt to kill, any woodcock, quail, ruffled grouse, called partridge, or gray squirrel, between the first day of January and the first day of October, shall be fined in a sum not exceeding twenty-five dollars.

The present proceeding was commenced by an information

presented  by  the  assistant  district  attorney  of  the  city  of  New
London,  Connecticut,  against  the  defendant,  Edgar  M.  Geer,
in  the  police  court  of  that  city,  charging  that  he  did,  on  the
19th  of  October,  1889,  unlawfully  receive  and  have  in  his
possession  certain  woodcock,  ruffled  grouse,  and  quail  killed
within  the  State  after  the  first  day  of  October,  1889,  with  the
wrongful  and  unlawful  intention  to  procure  their  transporta-
tion  without  the  limits  of  the  State.

Upon  the  information  the  judge  of  the  police  court  issued  to
the  sheriff  of  the  county,  and  to  his  deputies,  a  warrant  for  the
arrest  of  the  defendant  and  to  have  him  brought  before  that
court  to  answer  the  complaint.     The  defendant  being  brought
before  the  court  pleaded  to  the  complaint  that  he  was  not  guilty,
but,  as  it  is  alleged,  the  court,  having  inquired  into  the  matter,
adjudged  him  to  be  guilty,  and  that  he  pay  a  fine  of  a  specified
amount,  together  with  the  costs  of  the  prosecution,  and  stand
committed  until  the  judgment  be  complied  with.     From  that
decision  the  accused  appealed  to  the  next  session  of  the  Crim-
inal  Court  of  Common  Pleas  to  be  held  for  New  London
County,  on  the  second  Tuesday  of  December,  1889.     At  that
court  and  term  he  appeared  and  demurred  to  the  complaint
on  the  ground,  first,  that  the  matters  contained  therein  did
not  constitute  an  offence;  second,  on  the  ground  that  it  did
not  allege  that  the  birds  were  killed  for  the  purpose  of  being
conveyed  beyond  the  limits  of  the  State;  third,  on  the  ground
that  section  2546  of  the  General  Statutes  of  Connecticut,  under
which  the  complaint  was  brought,  was  void  and  unconstitu-
tional,  so  far  as  it  could  be  construed  to  forbid  the  transporta-
tion  of  the  birds  killed  from  the  State,  or  having  possession  of
them  with  intent  to  procure  their  transportation  to  another
State,  averring  that  the  birds  had  been  sold  to  parties  in  such
other  State,  and  had  begun  to  move  as  an  article  of  interstate
commerce;  fourth,  on  the  ground  that  it  appeared  in  the  com-
plaint  that  the  defendant  was  not  guilty  under  the  section  if
the  birds  were  bought  by  him  in  the  markets  of  the  State  as
merchandise,  and  had  begun  to  move  to  another  State  as  an
article  of  interstate  commerce,  such  facts  being  averred  in  the
complaint  to  exist.

The Criminal Court of Common Pleas overruled the demurrer, and found that the complaint was sufficient, and the accused having declined to answer over, it was held that he was guilty of the offence charged, and he was accordingly sentenced to pay a fine of twenty-five dollars and the costs of the prosecution, and to stand committed until the judgment was complied with. The defendant thereupon appealed from the judgment rendered by the Criminal Court of Common Pleas to the Supreme Court of Errors of the State for the Second Judicial District, to be held at Norwich on the last Tuesday of May, 1891. On that day the Supreme Court of Errors found that there was no error apparent in the judgment of the Criminal Court of Common Pleas, and accordingly affirmed it. An appeal was then taken from the decision of the Supreme Court of Errors to the Supreme Court of the United States, in which latter court the plaintiff in error assigns the following as grounds of error in the lower court:

1st. In refusing to hold that so much of section 2546 of the General Statutes, under which the complaint was brought, as might be construed to forbid the transportation from the State of the birds described, lawfully killed and permitted by the laws of the State to become the subject of traffic and commerce, was unconstitutional and void.

2d. In refusing to hold that so much of the section as might be construed to forbid the receiving and having in possession, with intent to procure the transportation thereof to another State, the birds described, lawfully killed, and permitted by the laws of the State to become the subject of traffic and commerce, was unconstitutional and void.

3d. In holding that the defendant was guilty of an offence under the section if the birds were lawfully killed in the State, and were bought by the defendant in the market of the State as merchandise, and had begun to move as an article of interstate commerce.

And this court, notwithstanding the errors assigned, affirms the judgment of the Supreme Court of Errors of Connecticut.

The record sent to it from the Supreme Court of Errors of the State presents the questions, supposed to be involved, in

a very confused and indistinct manner. Disentangling them from the mass of words, used, it appears that the Supreme Court of Errors held that it was an offence against the statute, upon which the information was filed in the police court of New London, for the accused to have in his possession any of the birds mentioned killed in the State within the period designated, for the purpose of transporting them without the State, and that it was to be inferred, under the law, that the birds were killed within the State for that purpose. But if that constitutes the offence at which the statute aimed, the information is defective in not alleging that the birds were killed for the purpose stated, that is, of conveying them beyond the limits of the State, and thus that they were unlawfully killed.

The transportation of birds described to another State, which were lawfully killed, does not constitute an offence under the statute. The transportation against which the statute was levied was that of birds *unlawfully* killed; the evident object of the law being to prevent birds *unlawfully* killed from being transported to the markets of another State. The law was directed against the killing of the birds within certain designated months of the year; and, in furtherance of that law, the transportation of them to another State was declared to be unlawful. The Supreme Court of Errors held that it was not unconstitutional for the State to enact that birds might be killed and sold or held for domestic consumption only; and that although the birds became a lawful subject of property when killed within the State for the purpose of food, that it was competent for the State to limit their sale for that purpose to the needs of domestic consumption. And this court, in affirming the judgment of the Supreme Court of Errors, appears to sanction that doctrine; but to its soundness I cannot yield assent.

When any animal, whether living in the waters of the State or in the air above, is lawfully killed for the purposes of food or other uses of man, it becomes an article of commerce, and its use cannot be limited to the citizens of one State to the exclusion of citizens of another State. Although

there are declarations of some courts that the State possesses a property in its wild game, and when it authorizes the game to be killed and sold as an article of food it may limit the sale only for domestic consumption, and the Supreme Court of Errors of Connecticut in deciding the present case appears to have held that doctrine, I am unable to assent to its soundness, *where the State has never had the game in its possession or under its control or use.* I do not admit that in such case there is any specific property held by the State by which, in the exercise of its rightful authority, it can lawfully limit the control and use of the animals killed to particular classes of persons, or citizens, or to citizens of particular places or States. But on the contrary, I hold that where animals within a State, whether living in its waters or in the air above, are, at the time, beyond the reach or control of man, so that they cannot be subjected to his use or that of the State in any respect, they are not the property of the State or of any one in a proper sense. I hold that until they are brought into subjection or use by the labor or skill of man, they are not the property of any one, and that they only become the property of man according to the extent to which they are subjected by his labor or skill to his use and benefit. When man by his labor or skill brings any such animals under his control and subject to his use, he acquires to that extent a right of property in them, and the ownership of others in the animals is limited by the extent and right thus acquired. This is a generally recognized doctrine, acknowledged by all States of Christendom. It is the doctrine of law, both natural and positive. The Roman law, as stated in the Digest, cited in the opinion of the majority, expresses it as follows: " That which belongs to nobody is acquired by the natural law by the person who first possesses it." A bird may fly at such height as to be beyond the reach of man or his skill, and no one can then assert any right of property in such bird.; it cannot then be said to belong to any one. But when from any cause the bird is brought within the reach and control or use of man, it becomes at that instant his property, and may be an article of commerce between him and citizens of the same or of other States.

In an opinion written by me some years since I had occasion to speak of this rule of law. I there said that it was a general principle of law, both natural and positive, that where a subject, animate or inanimate, which otherwise could not be brought under the control or use of man, is reduced to such control or use by his individual labor or skill, a right of property in it is acquired. The wild bird in the air belongs to no one, but when the fowler brings it to the earth and takes it into his possession it is his property. He has reduced it to his control by his own labor, and the law of nature and the law of society recognize his exclusive right to it. The pearl at the bottom of the sea belongs to no one, but the diver who enters the water and brings it to light has property in the gem. He has by his own labor reduced it to possession, and in all communities and by all law his right to it is recognized. So the trapper on the plains and the hunter in the north have a property in the furs they have gathered, though the animals from which they were taken roamed at large and belonged to no one. They have added by their labor to the uses of man an article promoting his comfort which, without that labor, would have been lost to him. They have a right, therefore, to the furs, and every court in Christendom would maintain it. So when the fisherman drags by his net fish from the sea, he has a property in them, of which no one is permitted to despoil him. *Spring Valley Water Works* v. *Schottler*, 110 U. S. 347, 374.

In *State of Kansas* v. *Saunders*, 19 Kansas, 127, the defendant was charged, as the agent of the Adams Express Company, with receiving at Columbus, Kansas, "certain prairie chickens, which had been recently killed as game" and shipping them to the city of Chicago, in the State of Illinois. The statute under which he was prosecuted made it unlawful for any person to transport or to ship any animals or birds mentioned, among which were prairie chickens, out of the State of Kansas, and subjected him on conviction thereof to a fine of not less than ten nor more than fifty dollars. The defendant admitted the facts as alleged, but contended that such acts constituted no offence, claiming that the statute of the State

under which the proceedings against him were commenced was unconstitutional and void. The District Court held the statute valid, and found the defendant guilty, and sentenced him to pay a fine of ten dollars and costs of prosecution. From the conviction and sentence he appealed to the Supreme Court of Kansas, which reversed the judgment of the District Court, holding "that no State can pass a law (whether Congress has already acted upon the subject or not) which will directly interfere with the free transportation from one State to another, or through a State, of anything which is or may be a subject of interstate commerce;" and referred to the case of *Welton* v. *Missouri*, 91 U. S. 275, 282, where it was held by this court that "the fact that Congress has not seen fit to prescribe any specific rules to govern interstate commerce, does not affect the question. Its inaction on this subject, when considered with reference to its legislation with respect to foreign commerce, is equivalent to a declaration that interstate commerce shall be free and untrammeled."

I do not doubt the right of the State, by its legislation, to provide for the protection of wild game, so far as such protection is necessary for their preservation or for the comfort, health or security of its citizens, and does not contravene the power of Congress in the regulation of interstate commerce. But I do deny the authority of the State, in its legislation for the protection and preservation of game, to interfere in any respect with the paramount control of Congress in prescribing the terms by which its transportation to another State, when killed, shall be restricted to such conditions as the State may impose. The absolute control of Congress in the regulation of interstate commerce, unimpeded by any state authority, is of much greater consequence than any regulation the State may prescribe with reference to the place where its wild game, when killed, may be consumed.

When property, like the game birds in this case, is reduced to possession it becomes an article of commerce and may be the subject of sale to the citizens of one State or community, or to the citizens of several. The decision of the court, however, would limit the right of sale of such property, however

valuable it may become, and whether living or killed, to the directions of the State or community in which the property is found, and would convert it from the freedom of use which belongs to property in general to the limited use of the persons or communities where found, or to a particular class to which only property possessed of special ingredients or qualities is limited. I do not think that it lies within the province of any State to confine the excellencies of any articles of food within its borders to its own fortunate inhabitants to the exclusion of others, and that it may lawfully require that game killed within its borders shall only be eaten in such parts of the country as it may prescribe.

By the Constitution of the United States it has been adjudged that commerce between the States is under the absolute regulation of Congress, and that whenever an article of property begins to move from one State to another, commerce between the States has commenced, and that with its control or regulation no State can interfere. *Welton* v. *Missouri*, 91 U. S. 275; *Henderson* v. *New York*, 92 U. S. 259; *Chy Lung* v. *Freeman*, 92 U. S. 275; *Ward* v. *Maryland*, 12 Wall. 418; *State Tax on Railway Gross Receipts*, 15 Wall. 284; *Sherlock* v. *Alling*, 93 U. S. 99.

I therefore dissent from the conclusion of the majority of my associates in affirming the judgment of the Supreme Court of Errors of Connecticut.

Mr. Justice Harlan dissenting.

The statutes of Connecticut declare that " every person who shall buy, sell, expose for sale, or have in his possession for the purpose, or who shall hunt, pursue, kill, destroy or attempt to kill any woodcock, quail, ruffled grouse, called partridge, or gray squirrel between the first day of January and the first day of October, the killing or having in possession of each bird or squirrel to be deemed a separate offence, . . . shall be fined not more than $30." They also provide that " no person shall at any time kill any woodcock, ruffled grouse or quail for the purpose of conveying the same beyond the limits of the State; or shall transport or have in his posses-

sion, with intention to procure the transportation beyond said limits, any such birds killed within this State. The reception by any person within this State of any such bird or birds for shipment to a point without the State shall be *prima facie* evidence that said bird or birds were killed within the State for the purpose of carrying the same beyond its limits."

The plaintiff in error was not charged with having in his possession game that had been killed "for the purpose of conveying the same beyond the limits of the State." It is admitted that the game in question was lawfully killed, that is, was killed during what is called the "open season." But the charge was that the defendant unlawfully received and had in his possession, with the wrongful and unlawful intent to procure the transportation of the same beyond the limits of the State, certain woodcock, ruffled grouse and quail killed within the State after the first day of October.

I do not question the power of the State to prescribe a period during which wild game within its limits may not be lawfully killed. The State, as we have seen, does not prohibit the killing of game altogether, but permits hunting and killing of woodcock, quail, ruffled grouse and gray squirrels between the first day of October and the first day of January. The game in question having been lawfully killed, the person who killed it and took it into his possession became the rightful owner thereof. This, I take it, will not be questioned. As such owner he could dispose of it, by gift or sale, at his discretion. So long as it was fit for use as food, the State could not interfere with his disposition of it, any more than it could interfere with the disposition by the owner of other personal property that was not noxious in its character. To hold that the person receiving personal property from the owner may not receive it with the intent to send it out of the State is to recognize an arbitrary power in the government which is inconsistent with the liberty belonging to every man, as well as with the rights which inhere in the ownership of property. Such a holding would also be inconsistent with the freedom of interstate commerce which has been established by the Constitution of the United States. If the

majority had not held differently in the present case, I should
have said that discussion was unnecessary to show the sound-
ness of the propositions just stated.   But it seems that if the
citizen, whether residing in Connecticut or elsewhere, finds in
the markets of one of the cities or towns of that State game,
fit for food, that has been lawfully killed, and is lawfully in
the possession of the keeper of such market, he may, without
becoming a criminal, buy such game and take it into his pos-
session, provided his intention be to eat it, or to have it eaten,
in Connecticut.   But he will subject himself to a fine, as well
as to imprisonment upon his failing to pay such fine, if he
buys and take possession of such lawfully killed game, with
intent to send it to a friend in an adjoining State.

The court cites *McCready* v. *Virginia*, 94 U. S. 391, 395,
in which it was held that Virginia could restrict to its own
citizens the privilege of *planting* oysters in the streams of
that State, the soil under which was owned by it.   But I can-
not believe that it would hold that oysters, which had been
lawfully taken out of such streams, and which had been law-
fully planted, could not be purchased in Virginia, with the in-
tent to ship them to another State.   This court, in *Plumley*
v. *Massachusetts*, 155 U. S. 461, another of the cases cited by
the majority, sustained as valid a statute of Massachusetts,
enacted to prevent deception in the manufacture and sale in
that State of imitation butter, and which prohibited the sale
of oleomargarine, artificially colored so as to cause it to look
like genuine yellow butter.   But I cannot suppose that this
court will ever hold that a State could make it a crime to
purchase with the intent to send it to another State oleo-
margarine or genuine yellow butter that had been lawfully
manufactured within its limits.

Believing that the statute of Connecticut, in its application
to the present case, is not consistent with the liberty of the
citizen or with the freedom of interstate commerce, I dissent
from the opinion and judgment of the court.

Mr. Justice Brewer and Mr. Justice Peckham, not having
heard the argument, took no part in the decision of this cause.