## LILLY v. CONSERVATION COMMIS-SIONER OF LOUISIANA.
### No. 191.

District Court, E. D. Louisiana,
Baton Rouge Division.
Oct. 25, 1939.

John R. Land, Jr., of New Orleans, La., Walter P. Bauer, of Houston, Tex., and Edward M. Heath, of New Orleans, La., for complainant.

James O'Connor and A. P. Miceli, both of New Orleans, La., LeDoux Provosty, of Alexandria, La., and George M. Wallace, of Baton Rouge, La., for respondent.

R. E. Hardwicke, of Fort Worth, Tex., for intervenors.

Before HOLMES, Circuit Judge, and DAWKINS and BORAH, District Judges.

DAWKINS, District Judge.

Complainant is a resident and citizen of the State of Texas and seeks to enjoin the Conservation Commissioner of the State of Louisiana from enforcing a ruling under provisions of South Louisiana Order No. 3 dealing with the Eola oil field in the Parish of Avoyelles.

He first assailed the constitutionality of Act 225 of the Legislature of 1936, in its application to this case, but at the hearing for preliminary injunction, requested and was allowed to strike that ground from the bill, thereby confining his attack to the constitutionality and validity of the order

itself and of the manner of its enforcement by the Commissioner.

Complainant alleged, in substance, that by virtue of his ownership of the lease upon a certain described tract of land, consisting of some 23 acres, he had the right to produce the oil therefrom; that the Conservation Department of the State, being a part of the executive branch of the State government, possesses no legislative powers and that none can be delegated to it; and further, that the Legislature had, itself, in the Act, provided means for preventing waste, thereby leaving no discretion to the Commissioner.

There was attached to and made part of the bill, the said South Louisiana Order No. 3. Complainant alleged that it violates the provisions of the State and Federal Constitution as follows:

(1) That it is attempted legislation, prohibited by Section 1, Article IV of the State Constitution.

(2) That Section V of said order "does not allocate the allowable production among the various producers upon a reasonable basis, since it is on per well acreage basis alone and does not take into account, as provided by the Act the open flow test, bottom hole pressure, the difference in wells, the location thereof on the structure, the richness and thickness of sand, the estimated oil reserve of each well on the property, the porosity of the sand, the regularity of the producing formation, the degree of rock pressure, or hydrostatic pressure, as the case may be, the horizon of each well as compared to the water level in the field, and such other circumstances as would control the judgment of a practical operator in reaching a conclusion thereon."

(3) That the manner in which the allowable has been allocated to the various producers and specially to complainant is "discriminatory and constitutes a confiscation of complainant's property contrary to the due process and equal protection clauses of the Fifth and Fourteenth Amendments to the Constitution of the United States, U.S.C.A." In the event the order is found valid, which complainant denies, then the manner of its enforcement herein against him is "discriminatory and constitutes confiscation" for the following reasons:

Complainant applied for a permit to drill his well on June 5, 1939 and attached to his application a plat showing his leases covering 23 acres as well as the proposed locations of the well as required by Order No. 3; that on June 12, the Commissioner "illegally and arbitrarily rejected the said permit, notwithstanding that he knew that complainant was compelled to drill promptly to avoid forfeiting his lease;" that for a period of 22 days the Commissioner refused to grant the permit and on June 13, 1939, complainant spudded in on said lease in order to save it from forfeiture. Further, that he was discriminated against in that, on June 23, 1939, a permit was granted to one W. C. Feazel, permitting the drilling of a 17-acre tract; but that after the resignation of the then Governor, a permit was issued to complainant on June 27, 1939; that complainant completed his well on August 4, 1939, and it was capable of producing some 2,000 barrels of oil per day on open flow and 600 barrels of oil on a one quarter inch choke; further that the said Commissioner, without taking into consideration the elements or factors above mentioned, arbitrarily set the allowable for his well at 61.10 barrels per day "on a shape of tract" basis, notwithstanding the fact that other wells in the field were given allowables based on an acreage basis with total disregard for the shape of the tract on which said other wells were drilled, and in open discrimination and denial of complainant's rights under the Fourth and Fourteenth Amendments to the Federal Constitution. Further, that within the forty-eight hour period provided by the State statute, complainant filed his protest to this ruling on August 6, 1939, praying that he be given equal production to that of other producers in the field, 214.90 barrels per day, but that under date of August 23, the Commissioner arbitrarily reduced the allowable on petitioner's well to 29 barrels per day, notwithstanding the fact that the law provides that the excess allowable "shall remain in effect until a decision is reached." Further, that petitioner had been discriminated against, in that the Commissioner is required by the statute to "summarily render a decision", but had failed and refused to do so, since August 21, 1939.

For a "second cause" of action, in event the Court should hold South Louisiana Order No. 3 valid, the complainant reiterated the allegations of his "first cause of action" and attacked Rule 3 of Section IV of said Order, as "ultra vires, illegal, discriminatory, arbitrary and confiscatory" in that the Commissioner can only exercise

such powers as are specifically granted by the Legislature and that the "promulgation of said rule * * * is in violation of said Act 225 of 1936 and of the State Constitution; that said Rule 3, together with the schedules issued in connection therewith, as same is applied, construed and enforced against * * * complainant * * * is unreasonable, discriminatory and confiscatory" in violation of the Fifth and Fourteenth Amendments to the Federal Constitution.

For a "third cause of action", he reiterated all of the allegations of the first and second causes of actions and alleged that the Commissioner had designated the Eola field as being in Townships 1 and 2, S. R's. 2 and 3, East of Avoyelles Parish, as a "common source of supply", and that in excess of 20 wells had been drilled therein, but that the records in the Commissioner's office conclusively established that there was a fault in the field and complainant's well was on the down-throw so that oil was being produced from an entirely distinct source of supply from and unconnected with the other wells which were on the up-throw, and that notwithstanding Section 2 of Act 225 of 1936, requiring the taking into consideration of the factors therein provided, the same had been disregarded and the allowable fixed for complainant's well on the theory that it was a part of and affected by the wells on the up-throw. Otherwise, the allegations of this cause of action were substantially like the first two, except that it was alleged that in other fields of the State where conditions are substantially the same, an allowable of 400 barrels per day to each well had been made, and upon a proper regulation, complainant should be permitted to withdraw the same amount or else there would be clear discrimination between different sections of the State. diffe

For a "fourth cause of action" it was charged that the manner in which the Commissioner has applied regulations to the Eola field is contrary to Order No. 3 itself, in so far as complainant's property is concerned, in that it is not applied alike to all operators or all producing wells, since all other wells are give an allowable upon a surface acreage basis "as provided by Section 4 Rule 1 * * * while the allowable granted to complainant is set under 'the shape of tract basis'" and under Rule 3 of said Section IV accorded to complainant, only 10.44 barrels on 2.6 acres; that practically all tracts in the Eola

field are irregular in shape with reference to the width thereof, compared to length, and numerous tracts have irregular boundaries "bordering on bayous in the area." Complainant enumerated and tabulated the names of producers, number of wells and quantity of allowable of some fourteen producers, all of which, except three he alleges were given the full 214.90 barrels per day. One of these was the W. C. Jessel well, accorded 196.74 barrels per day, Sentel No. 2 with 107.45 barrels per day (or one-half unit) and the State Bayou Bouef No. 1, given 31.91 barrels per day; while complainant's well drilled on 23 acres has been given only 61.10 barrels. He further alleged that all of these wells were drilled on an acreage basis and in total disregard of the provisions of Rule 3 of Section IV as to sizes of tracts, distance from property lines and between wells, etc.; that on August 14, 1939, the Commissioner applied the "shape of the tract basis" to complainant's lease, which gave him only the 61.10 barrels per day and later reduced this to 29 barrels, all of which constituted arbitrary and discriminatory action in violation of the Constitution of the State and of the United States.

Complainant prayed for a writ of injunction, that upon trial South Louisiana Order No. 3 be held invalid for the reasons alleged, and in the alternative, the manner of enforcement be decreed arbitrary, discriminatory and as denying petitioner equal protection under the State and Federal Constitutions.

Succintly stated the attack is two-fold: First, upon the validity of South Louisiana Order No. 3, dated April 14, 1936, and secondly, upon the method and manner of its enforcement by the Commissioner as applied to complainant.

The situation in the Eola field was alleged to be as shown on the map or plat attached to the bill of complaint as "Exhibit B" and while the answer denied allegations with respect thereto, as it did most others, we had understood at the hearing that there was no substantial disagreement as to the map's correctness; yet, in the brief, the respondent has questioned its accuracy. In any event, we think the pertinent facts are substantially as follows:

The Eola field was discovered only recently and its limits have not been established. Complainant's lease and well are located on the extreme west side of the

proven territory; it consists of a tract less than 200 feet wide, North and South, and has a length, East and West, in excess of 5,000 feet with an area of 23 acres in round figures. The well was drilled in the extreme eastern end, nearest proven production, approximately 350 feet east and about 45 feet north of the point stated in the application for the permit. It was completed on August 4, 1939, and is capable of producing several hundred barrels of oil daily on a one inch choke. Drilling began on June 13, but the permit was not issued until the 27th of the same month. Complainant explains this "jumping of the gun" by the alleged unwarranted delay of the Commissioner in issuing the permit and the fact that it was necessary to prevent forfeiture of his lease. No question is raised about this point as we understand it. In issuing the permit, the Commissioner warned complainant that although it had been found he was entitled to the benefits of the exception allowing him to drill on a tract whose length was more than twice its width, he would be governed by a provision of Order No. 3 which, in such circumstances, limited the length to 1320 feet for computing the acreage to be used in determining the allowable. Multiplying this length by the width of less than 200 feet, produces an area of approximately 6 acres, and applying the permissible withdrawal of about 10 barrels per acre, gave the 61.10 barrels allotted complainant originally. As stated, it was later reduced to 29 barrels per day, because, as claimed by respondent, it was found the gas-oil ratio in the well amounted to 4,000 cubic feet, whereas the maximum permissible was about 2,000 cubic feet. It appears from some of the proof offered by complainant that the ratio was not in excess of 2,600 cubic feet, so that a substantial dispute exists on this issue which can not be determined until a trial on the merits.

Order No. 3 provided that no well should be drilled closer than 466 feet to a common property line, nor nearer to any other well than 933 feet. To this, an exception is made, where the owner of a small or irregular tract is unable to pool or unitize with others so as to comply with the requirement that the length shall not be more than twice the width and that permits shall be issued only for 20 acre tracts (with the well drilled in the center), under which a permit will issue, limited in production, to the number of acres actually included in a space whose length must not exceed its width, and applying the number of barrels per acre allowed to the whole field.

More than two-thirds of the twenty-two wells in the field violate the restriction that they shall not be drilled closer than 466 feet to the property lines or nearer to the other wells than 933 feet. This is also true of complainant's well as to the first of these two restrictions. The first few wells, referred to as discovery wells, were drilled before Order No. 3 was issued, but it would seem that, if the matter is to be handled impartially, all must be governed by the same rules from the time they became effective.

It is conceded by complainant, in brief, that the evidence is too much in conflict to permit a decision at this time of the question of whether his well, because of the fault line, is drawing oil from a source independent and separate from that of the others which are on the up-throw (except one) east of the fault.

The affidavits offered by respondent tend to show that none of the wells in the field exceed the gas-oil ratio other than that of complainant. They also established that the allowable to the wells, other than complainant's is figured on an acreage basis by multiplying the average width by the average length, to which is applied the rule of approximately 10 barrels per acre. It does not appear that in any case, the Commissioner has permitted other operators to use a greater length than 1320 feet in computing acreage. It is true that some of these tracts are of irregular shape and that the proximity of wells to property lines and to each other probably results in drainage from the adjoining tracts or leases over the common line, whether the area of 20 acres around the well is considered as a circle or a rectangle; yet there is much dispute as to the extent to which this exists. However, it appears that this is more a matter of concern to the adjacent property owners than it is to the present petitioner, so long as the drilling does not impinge upon his lease. Of course, if it appeared that other operators were being allowed to produce the maximum allowable per well or a greater proportion, under conditions like or similar to those affecting complainant, it would be discriminatory even though this did not serve to take oil from his property. To be fair and just and to accord equal rights and protection to all under the law, it is essential that they be treated alike.

Before issuing South Louisiana Order No. 3 on April 14, 1939, the Commissioner had held an open hearing at Baton Rouge on March 15, preceding, notice of which had been given and all attending were invited to express themselves and did so mainly as to what should be done with respect to size of tract to be used as a unit for each well. The experts of the Department were present. No witnesses were sworn, but many persons interested or their representatives gave their views. Some thought 20 acres should constitute a unit, others 10 acres, and still others less, because they were interested in tracts consisting of only a few acres. There does not appear to have been a prior investigation of the field by the experts and report to the Commissioner. As previously stated, the field had only recently been discovered, representatives gave their views. Some basis for operation according to regulations as applied to other fields in the State. The Commissioner, by the said order of April 14, fixed the unit at 20 acres and prescribed other regulations as to how drilling should be conducted.

In actual operation the allowable has been computed almost entirely upon a surface acreage basis and no consideration given to the several other factors mentioned in the Act 225 of 1936.

■ Since the complainant has withdrawn his attack upon the constitutionality of Act 225 of 1936, and confined it to, first, the validity of the ordinance under the statute, and secondly, to the alleged discriminatory manner of its enforcement as to him, we need not go into the question of whether the Act improperly attempts to delegate powers which the Legislature alone could exercise. To the extent which the law clearly authorizes the Commissioner to act, under these circumstances, it must be assumed that the same was constitutionally done.

In the case of Ohio Oil Company v. State of Indiana, 177 U.S. 190, 209, 20 S.Ct. 576, 584, 44 L.Ed. 729, the Supreme Court of the United States, in 1899, had occasion to consider the power of a State in dealing with the fugitive minerals, such as gas and oil, and through Mr. Justice White (later Chief Justice), after discussing the analogy between them and wild animals, had this to say:

"It being true as to both animals feræ naturæ and gas and oil, therefore, that whilst the right to appropriate and become the owner exists, proprietorship does not take being until the particular subjects of the right become property by being reduced to actual possession. The identity, however, is for many reasons wanting. In things feræ naturæ all are endowed with the power of seeking to reduce a portion of the public property to the domain of private ownership by reducing them to possession. In the case of natural gas and oil no such right exists in the public. It is vested only in the owners in fee of the surface of the earth within the area of the gas field. This difference points at once to the distinction between the power which the lawmaker may exercise as to the two. In the one, as the public are the owners, every one may be absolutely prevented from seeking to reduce to possession. No devesting of private property under such a condition can be conceived, because the public are the owners, and the enacting by the state of a law as to the public ownership is but the discharge of the governmental trust resting in the state as to property of that character. Geer v. Connecticut [supra], 161 U.S. 519, 525, 16 S.Ct. 600, 40 L.Ed. 793, 795. On the other hand, as to gas and oil the surface proprietors within the gas field all have the right to reduce to possession the gas and oil beneath. They could not be absolutely deprived of this right which belongs to them without a taking of private property. But there is a coequal right in them all to take from a common source of supply, the two substances which in the nature of things are united, though separate. It follows from the essence of their right and from the situation of the things as to which it can be exerted, that the use by one of his power to seek to convert a part of the common fund to actual possession may result in an undue proportion being attributed to one of the possessors of the right to the detriment of the others, or by waste by one or more to the annihilation of the rights of the remainder. Hence it is that the legislative power, from the peculiar nature of the right and the objects upon which it is to be exerted, can be manifested for the purpose of protecting all the collective owners, by securing a just distribution, to arise from the enjoyment, by them, of their privilege to reduce to possession, and to reach the like end by preventing waste. This necessarily implied legislative authority is borne out by the analogy suggested by things feræ naturæ, which it is unquestioned the legislature has

the authority to forbid all from taking, in order to protect them from undue destruction, so that the right of the common owners, the public, to reduce to possession, may be ultimately efficaciously enjoyed. Viewed, then, as a statute to protect or to prevent the waste of the common property of the surface owners, the law of the state of Indiana which is here attacked because it is asserted that it devested private property without due compensation, in substance, is a statute protecting private property and preventing it from being taken by one of the common owners without regard to the enjoyment of the others. Indeed, the entire argument upon which the attack on the statute must depend involves a dilemma, which is this: If the right of the collective owners of the surface to take from the common fund, and thus reduce a portion of it to possession, does not create a property interest in the common fund, then the statute does not provide for the taking of private property without compensation. If, on the other hand, there be, as a consequence of the right of the surface owners to reduce to possession, a right of property in them in and to the substances contained in the common reservoir of supply, then, as a necessary result of the right of property, its indivisible quality, and the peculiar position of the things to which it relates, there must arise the legislative power to protect the right of property from destruction. To illustrate by another form of statement the argument is this: There is property in the surface owners in the gas and oil held in the natural reservoir. Their right to take cannot be regulated without devesting them of their property without adequate compensation, in violation of the Fourteenth Amendment, U.S.C.A. Const. and this although it be that if regulation cannot be exerted one property owner may deprive all the others of their rights, since his act in so doing will be damnum absque injuria. This is but to say that one common owner may devest all the others of their rights without wrong-doing, but the lawmaking power cannot protect all the owners in their enjoyment without violating the Constitution of the United States.

"These considerations are sufficient to dispose of the case. But as there are several contentions which seem to have been considered, in argument, as resting on different premises, though such in reason is not the case, we briefly notice them separately: First. It is argued that as the gas, before being allowed to disperse in the air, serves the purpose of forcing up the oil, therefore it is not wasted, hence is not subject to regulation. Second. That the answer averred that the defendant was so situated as not to be able to use or dispose of the gas which comes to the surface with the oil; from which it follows that the gas must either be stored or dispersed in the air. Now, the answer further asserted that when the gas is stored and not used, the back pressure, on the best-known pump, would, if not arresting its movement, at least greatly diminish its capacity. Hence it is said the law by making it unlawful to allow the gas to escape made it practically impossible to profitably extract the oil. That is, as the oil could not be taken at a profit by one who made no use of the gas, therefore he must be allowed to waste the gas into the atmosphere, and thus destroy the interest of the other common owners in the reservoir of gas. These contentions but state in a different form the matters already disposed of. They really go, not to the powers to to make the regulations, but to their wisdom. But with the lawful discretion of the legislature of the state we may not interfere."

It can readily be seen that, without the power to regulate or control conditions in an oil field, the temptation to acquire quick riches might easily produce an intolerable situation in drilling indiscriminately upon any size or shape of tract, sufficient to permit derrick operations, resulting in waste and exhaustion of underground energy consisting of natural gas, etc., and ultimately restricting recovery, involving useless expenditures by operators and preventing some, if not all, from recovering their investments. Such a condition, it would seem, should be subject to the police power of the State, not only to prevent waste, but to insure a fair and reasonable participation, by the surface owners in the common pool within the producing area. Especially is this true in Louisiana, where, under the settled law, differently from some other states, the owner of the surface or holder of a mineral lease does not actually own the fugitive minerals of gas and oil, but merely an exclusive right of servitude to go upon and explore for and produce the same. The ownership becomes vested only when the minerals are brought to the surface and reduced to possession. We believe that the decision quoted from above, as well as other cases unnecessary to cite, clearly

sustain the power of the State to prescribe such regulations in regard to spacing of wells, manner of drilling, etc., as are reasonably necessary to distribute equitably among the surface proprietors the right to produce these minerals from a given source. We think the Act 225 of 1936 has ·for its purpose the accomplishment of that end.

■ As suggested, in the brief for respondent, complainant has not attacked the maximum allowable set by the Commissioner, but bases his complaint upon the contentions heretofore outlined, that the Commissioner exceeded his authority by the provisions of General Order No. 3 itself, as well as in the manner of their enforcement with ' respect to the plaintiff. His assault in that direction, in effect, is confined to the complaint, that, while others in the field are permitted to withdraw the maximum allowable or some 214 barrels, regardless of their violation of the rules, with reference to the shape, size of tracts, location of wells with respect to the property lines and to each other, he alone has been subjected to the restriction of the order which reduces his producing acreage to only a fraction of his total lease, about 5 acres. However, as stated earlier, the evidence consisting at this time only of affidavits, not only fails to sustain that contention conclusively, as would seem necessary, but is in serious conflict and can only be satisfactorily determined after a trial upon the merits.

■ It does appear however, that the action of the Commissioner reducing the allowable from the originally fixed of 61.10 barrels, was arbitrary and on insufficient evidence, which justifies the enjoining of its enforcement until the case can be tried on its merits. We think that when he seeks to apply the exception, such as that based on gas and oil ratio, .denying one producer a proportionate right to participate in production, the necessity therefore must be clear and beyond question, otherwise an abuse of discretion would result, based upon the mere ispe dixit of the Commissioner, rather than the conditions as they actually existed. We are not prepared at this time to say that the failure of the Commissioner to use all of the factors provided by the statute in determining the allocation of production is sufficient to nullify what he has done. The failure in that respect except perhaps the gas-oil ration is equally applicable to all producers

and there would appear to be no discrimination against the complainant on that ground. The question of whether the Commissioner must use all of these considerations should not be decided upon this preliminary hearing.

For the reasons assigned, a preliminary injunction should issue restraining the Commissioner from enforcing the last reduction in the allowable to the complainant and directing that he should continue to permit complainant to withdraw his oil under the original order, without applying the gas-oil ratio until a hearing can be had on the merits.

Proper decree should be presented.